# UNITED STATES *v.* IRWIN.

# UNITED STATES *v.* PERRY.

APPEALS FROM THE COURT OF CLAIMS.

Nos. 1384, 1385. Submitted April 2, 1888. — Decided April 23, 1888

A statute entitled " An act referring to the Court or Claims," etc., " for examination and report," and enacting that " the claims " " be, and the same are hereby, referred to the Court of Claims for adjudication according to law, on the proofs heretofore presented, and such other proofs as may be adduced, and report the same to Congress " confers upon that court full jurisdiction to proceed to final judgment, as in the exercise of its ordinary jurisdiction.

A statute conferring upon the Court of Claims power to consider and render judgment for claims " for property claimed to have been taken and impressed into the service of the United States in the year 1857 by orders of Colonel Albert Sidney Johnston in command of the Utah expedition, as well as for property alleged to have been sold to the government " does not authorize that court to consider and give judgment for losses consequent upon the refusal of Colonel Johnston to permit the trains of the claimant to proceed upon their journey, arising from the mere detention and delay occasioned thereby.

It appearing from the findings of the court below that " plaintiff's animals were often used to aid in hauling government trains; and thus did extra work on insufficient food; " and this being a possible ground for recovery to some extent for property taken and impressed into the service of the United States; and it not appearing in the findings what amount is properly allowable therefor, the case is remanded for further proofs and findings in that respect.

THESE were appeals from judgments rendered against the United States in the Court of Claims. The case is stated in the opinion.

*Mr. Attorney General,* and *Mr. Assistant Attorney General Howard* for appellant in both cases.

*Mr. William E. Earle* and *Mr. James L. Pugh, Jr.,* for appellees in both cases.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Congress passed an act, approved July 8, 1886, entitled "An act referring to the Court of Claims the claims for property seized by General Johnston on the Utah expedition for examination and report," which enacts "that the claims of Joseph C. Irwin and Company, and C. A. Perry and Company, freighters, for property claimed to have been taken and impressed into the service of the United States in the year 1857, by orders of Colonel Albert Sidney Johnston, in command of the Utah expedition, as well as for property alleged to have been sold to the government, be, and the same are hereby, referred, with all the papers relating thereto, to the Court of Claims for adjudication, according to law, on the proofs heretofore presented, and such other proofs as may be adduced, and report to the same to Congress."

In pursuance of this act the parties named therein filed their respective petitions in the Court of Claims, stating the grounds and particulars of their demands for judgment. Judgments were rendered therein in the ordinary form in the case of J. C. Irwin and Company for the recovery of the sum of $21,600, and in the case of Charles A. Perry and Company for the sum of $44,025. From these judgments the United States prosecutes the present appeals.

The facts in the two cases as found by the Court of Claims are substantially the same. The firm of J. C. Irwin and Company, at the time of the occurrences hereinafter set forth, were engaged in freighting across the plains by means of wagon trains, and in June, 1857, were under contract to

transport from Atchison, Kansas, to Salt Lake City 75 wagon loads of merchandise, and late in the summer of that year started their trains on that journey. Charles A. Perry and Company, in August, 1857, were doing a general merchandise business at Salt Lake City, and in that month started three ox trains, two of 20 wagons each, and one of 18 wagons, with five wagons drawn by mules, from Fort Leavenworth, Kansas, to Salt Lake City. All the trains of both parties reached Rocky Ridge early in October, 1857, and were progressing successfully on their journey. The animals were in good condition, and making from 18 to 20 miles per day. At this point they were met by United States troops, under command of Lieutenant-Colonel Smith, who ordered the trains to proceed no further without his permission. Lieutenant-Colonel Smith was under command of Colonel Albert Sidney Johnston. The latter on joining the command issued an order addressed to the parties in interest, as follows:

"Headquarters Army of Utah,
"South Pass, October 19, 1857.

"SIR: The colonel commanding directs me to inform you, in reply to your letter of to-day, that no goods or supplies of any kind will be permitted to pass this army for Salt Lake City, or other points occupied by the Mormons, so long as they maintain a hostile attitude to the government of the United States."

On the 24th of October an order was issued prescribing the order of the march, and designating the position to be maintained on the march and in the camp by the plaintiffs' trains. Plaintiffs did not seek or desire military protection, and requested Colonel Johnston to be allowed to proceed on their journey, as they were not, in their opinion, in danger from the Mormons. This request was denied. Plaintiffs were required to have their teams yoked and ready by ten in the morning, and they often had to stand for two hours in consequence of delay in the general movement. The teams always got into camp late, and consequently were grazed at great disadvantage. They were also limited to a defined and

restricted space assigned them, and were not permitted by the military authorities to go beyond this space. The animals belonging to the army arrived first at camp, and were posted on the best grass. As a necessary result freighters' teams were insufficiently fed. Plaintiffs' animals were often used to aid in hauling the government trains, and thus did extra work on insufficient food. The orders requiring plaintiffs' trains to move with the army column necessarily impeded their progress, and held them back until the bad weather set in. For these reasons the plaintiffs' stock became greatly reduced in flesh, and many died from overwork and starvation. Plaintiffs' trains were loaded with goods and merchandise, notoriously intended for trade with the Mormon inhabitants of the Territory of Utah, who were then in avowed rebellion, and threatened war with the government of the United States, but plaintiffs were ignorant of this state of affairs upon starting, and until arrival at Rocky Ridge. It is also found by the Court of Claims that R. H. and James Porter were also freighters, like the plaintiffs, and were detained at the same time under substantially the same circumstances as those already set forth. An act for their relief, passed February 18, 1887, 24 Stat. 900, appropriated the sum of $10,000, less the sum of $750 theretofore paid them " in full for all claims for damages or compensation for property impressed by order of Colonel Johnston, in command of the United States troops en route for Utah in 1857."

Two questions were presented on the part of the United States on the trial of the cases in the Court of Claims, and are renewed in argument here. They are, 1st, that the act of Congress of July 8, 1886, referring these claims to the Court of Claims, does not authorize a final judgment against the United States, but only such findings as, being reported to Congress, shall serve as the basis in its discretion for future legislative action; and, 2d, that, supposing the judgments of the Court of Claims under the act to be final, they are erroneous, because founded on allowances for consequential damages to the property of the plaintiffs, by reason of detention and delay, not within the limitation prescribed by the act of

Congress, which authorized judgment only for property taken and impressed into the service of the United States.

In support of the first proposition, it is argued by the Attorney General that the direction contained in the act addressed to the Court of Claims to "report the same to Congress," taken in connection with the title, which describes it as "An act referring to the Court of Claims the claims for property seized by General Johnston on the Utah expedition for examination and report," sufficiently indicates the intention of Congress that the conclusions of the Court of Claims should not be final, but subject to revision at the discretion of Congress. But, in our opinion, the controlling words of the act are those which declare that the claims of the parties are thereby referred to the Court of Claims "for adjudication according to law." The force of this phrase cannot be satisfied by anything less than a formal, regular, and final judgment of the judicial tribunal, to which the matter is submitted, acting upon the acknowledged principles of law applicable to the circumstances of the case. All such judgments were required by existing law to be reported to Congress, and the addition of words to the same effect in this statute, while being perhaps unnecessary, does not change the character of the judgments to be reported.

On the second question, however, we are of the opinion that the Court of Claims has erred. The reference made by the statute is limited by its express language to a judgment "for property claimed to have been taken and impressed into the service of the United States in the year 1857 by orders of Colonel Albert Sidney Johnston, in command of the Utah expedition, as well as for property alleged to have been sold to the government." Of course there would be no doubt as to the legality of so much of the claims as arise upon sales proven to have been made by the plaintiffs to the government of their property for its use; but in point of fact no such sales are found to have been made. So far as the judgments embrace allowances for losses consequent upon the refusal of Colonel Johnston to permit the plaintiffs' trains to proceed upon their journey, arising from the mere detention and delay

occasioned thereby, they go beyond the intention of the act of Congress. It was the clear dictate of military duty on the part of Colonel Johnston to prevent information and supplies from going forward to the public enemy. To effect this, he issued his order "that no goods or supplies of any kind will be permitted to pass this army for Salt Lake City or other points occupied by the Mormons so long as they maintain a hostile attitude to the government of the United States." There is nothing in the terms of this order to require the plaintiffs to keep with the troops; they were only forbidden to pass them in advance. They might have remained at Rocky Ridge, or they might have retraced their steps and returned. This perhaps would also have involved loss in breaking up their venture, and perhaps damage to the property constituting the trains; but it would not have been taking and impressing the property into the service of the United States. So far as appears from the finding of facts, it was the choice of the plaintiffs to remain with Colonel Johnston's column and proceed with it. In making this choice, they elected to submit to the necessary military orders governing the march and the camp, and to any inconveniences and losses necessarily resulting therefrom. The case in that respect does not differ from what it would be on the supposition of their having been ordered and compelled to remain at Rocky Ridge or to return. Even if it be a just inference of fact, that the plaintiffs were under compulsion in keeping with the column of Colonel Johnston, it by no means follows from that alone that their property was taken and impressed into the service of the United States in the sense of the act of Congress of July 8, 1886. However proper it might have been for the legislature to have provided indemnity for the losses occurring by reason simply of the detention thus occasioned, we cannot think it was the intention of the act to go beyond payment for property actually used and employed by the government in its service. To require the plaintiffs' trains to remain with the military force, in order to insure the success of the expedition by preventing the enemy from obtaining information and supplies, cannot be construed as a seizure and impressment of their property into the public service.

In opposition to this conclusion we are referred to the opinion of Mr. Bates while Attorney General (10 Opinions Attorneys General, 21), upon the case of the Porters, mentioned in the statement of facts found by the Court of Claims. It seems their claim was embraced, with those of the plaintiffs in these cases, in the original draft of the act of July 8, 1886, as it passed the Senate, but before final passage was struck out because their claim was pending before the Treasury Department. The accounting officers of the Treasury allowed their claim, presumably upon the strength of the opinion of the Attorney General, who held that they were entitled to an allowance and payment under the provisions of the act of March 3, 1849, providing for the payment for horses and other property lost or destroyed in the military service of the United States. The Attorney General, it is true, expressed the opinion that the order of Colonel Johnston reduced the train of the claimants to military control, and thereby subjected it to the losses proved, for the purpose of depriving the Mormons of any benefit from it, and was therefore an impressment into the military service within the meaning of the act of March 3, 1849. But it is evident that he did not rest his recommendation for the payment of the claimants on that consideration, for the opinion proceeds as follows: "But whatever may have been the legal result of the order of General Johnston, the fact is well proved that the property of the claimants was afterwards actually reduced to military service. The loss of the army cattle compelled a resort to those of the trains, and several witnesses, servants of the government and of the claimants, state that the cattle of Messrs. Porter were used indiscriminately with the army cattle to haul the army wagons. In this service many of them died and many were abandoned, exhausted from overwork and want of forage: many were killed and eaten by the army, and for these I understand the claimants have been already paid under this law. I am unable to see any distinction between the cattle that were eaten and those that were worked in the army trains and lost, for both were certainly impressed within the meaning of the statute. Nor do I see how any distinction

can be made between the cattle that' actually died when in the army trains and those that may have been lost between South Pass and Fort Scott; for when they had been once used with the army cattle to haul the trains they were actually employed in the service of the United States, being under military control and liable to be applied to that' work when needed. It is too rigid a construction to say that 'actual service' means only the time employed in labor. Possession and the power to use the animal, Judge Black says in Oldham's case (Man's Opinions No. 59), is the test of employment within the meaning of the statute. and, these General Johnston undoubtedly had."

The amount found due to the Porters by the accounting officers of the Treasury was appropriated by Congress by the act of February, 1887, heretofore referred to. The facts relied upon by the Attorney General, as justifying the payment in their case, of actual service in the employment of the United States, do not appear in the present cases.

Neither does the conclusion of the Court of Claims derive support from anything said or decided by this court in the case of *Mitchell* v. *Harmony*, 13 How. 115. There the plaintiff was forced against his will to accompany the American troops with his wagons, mules, and goods in a hazardous expedition, and for the purpose of strengthening their military force. His wagons and mules were used in the public service in the battle of Sacramento, and on the march afterwards; when the place was evacuated they were left behind unavoidably, as nearly all of his mules had been lost in the march and the battle; and when the Mexican authorities regained possession of the place his goods were seized and confiscated and totally lost to him. The jury found from the evidence that there was an actual seizure of the plaintiff's property by the officer; and in speaking to that point the court say (p. 136): "We do not see any evidence in the record from which the jury could have found otherwise. From the moment they were taken possession of at San Elisario, they were under the control of Colonel Doniphan, and held subject to his order. They were no longer in the possession or control of the plain-

tiff, and the loss which happened was the immediate and necessary consequence of the coercion which compelled him to accompany the troops. It is true the plaintiff remained with his goods, and took care of them so far as he could during the march, but whatever he did in that respect was by the orders or permission of the military authorities. He had no independent control over them."

As it appears from the findings of the Court of Claims that "plaintiffs' animals were often used to aid in hauling government trains, and thus did extra work on insufficient food," there is perhaps ground for a recovery to some extent under the terms of the act for property taken and impressed into the service of the United States; but we are unable from the findings to determine the amount properly allowable on that account. It becomes necessary, therefore, to reverse the judgments in both cases, and remand them to the Court of Claims for more definite and specific findings; and inasmuch as we have determined that the facts as found by the Court of Claims in the present record do not enable us to determine what property of the plaintiffs was taken and impressed into the service of the United States by Colonel Johnston, the cases may be opened for further proofs on that point.

*The judgments are therefore reversed, and the causes remanded to the Court of Claims for further proceedings in accordance with this opinion.*