## ORGERON ET UX. v. LOUISIANA POWER & LIGHT CO. ET AL.

___

(March 7, 1932. Opinion and Decree.)
(April 4, 1932. Rehearing Refused.)
(May 23, 1932. Writs of Certiorari and Review Refused by Supreme Court.)

___

Oliver S. Livaudais, of New Orleans, attorney for plaintiffs, appellants.

L. L. Morgan and A. S. Cain, Jr., of New Orleans, and D. M. Ellison, of Baton Rouge, attorneys for appellee Louisiana Highway Commission.

JANVIER, J. This matter comes to us on appeal from a judgment of the civil district court dismissing, on exception of no cause of action, a suit for damages for alleged unlawful death brought against various defendants, including the exceptor, Louisiana Highway Commission.

The sole question now before us is whether such commission, an agency or department of the state, may be sued for damages ex delicto.

Plaintiffs, Mr. and Mrs. Robert Orgeron, bring the action against Louisiana Power & Light Company, George Hoffman, Louisiana Highway Commission, and R. A. Cole. It is alleged that Leopold Orgeron, the minor son of plaintiffs, was killed as the result of an automobile accident, which, it is averred, resulted from the joint negligence of the two individual defendants, each driving a motor vehicle, one within the scope of his employment as a servant of Louisiana Power & Light Company and the other within the scope of his employment by Louisiana Highway Commission.

The district judge dismissed the suit as against Louisiana Highway Commission, being of the opinion that the jurisprudence of the state of Louisiana, based on the written law of the state, makes it impossible to entertain a suit sounding in damages against the state, or any of its boards or departments. He strongly expressed the view, however, that, when such "agencies are created and performing the functions, which may perhaps be governmental in nature, and doing other works, * * * when carrying on these works through their agents, who are liable to commit torts and injure citizens * * * there should be absolute permission given to citizens to bring suits against those agencies, to recover for damages they sustain and have such compensation paid out of the fund in the same way that railroad companies or street car corporations doing public service, monopolistic by nature, and to have revenue sufficient to carry on all the operations of the corporation and sufficient also to pay the damages which are inflicted by the torts of its agents." He further stated, referring to the great works of various character now performed by states and state agencies, that "these great works can no more be carried on without torts and injuries committed by the state than they could by private corporations, or public service corporations."

The interesting opinion written on the subject by our brother below and the most persuasive argument presented by industrious counsel for plaintiffs have led us to delve rather deeply into the doctrine of immunity of the state from liability for damages, and we find that, from the earliest times, the doctrine has been in existence in this country, and that this was recognized by Mr. Justice Miller, in the very early case of Gibbons v. United States, 8 Wall. 269, 274, 19 L. Ed. 453, in which it was declared that:

"No government has ever held itself liable to individuals for the misfeasance, laches, or unauthorized exercise of power by its officers and agents."

While it is very evident that Mr. Justice Miller either did not intend to include in his reference the countries of Western Europe, or had overlooked the fact that those countries had, from very early times, admitted such liability, nevertheless there can be no doubt that, as to the English speaking countries, England and America, the doctrine of the immunity of the sovereign to assaults in the courts is universally accepted; that "the king can do no wrong"

has, as a necessary corollary, "the sovereign may not be forced to submit to suit." Originally the royal prerogative was purely personal, and it was therefore, from the beginning, illogical to apply it to the United States, where the sovereignty, if the governing authority may be so called, is so broadly distributed among the various governmental officials and departments and is, in fact, in theory at least, still with the people themselves.

"* * * In our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts." Yick Wo v. Hopkins, 118 U. S. 356, 370, 6 S. Ct. 1064, 1071, 30 L. Ed. 220.

But, even if on a sound foundation, when originally applied to the sovereign of old, it is more than doubtful if there is any semblance of reasonableness in applying it to the "sovereign," as the term is used in the United States today, for, while originally the sovereign concerned himself solely with purely governmental functions, today we find our governments, state and national, undertaking to perform works of every nature heretofore considered as being exclusively within the prerogative of the private individual or corporation and never conceived of as being within the rights or duties of a sovereign. Let it not be believed that we intend to criticize the modern trend. Whether it be socialistic, or whether it be for the good, or work to the detriment, of the people as a whole, we find it unnecessary to consider. It is sufficient that we recognize that the tendency exists, and that we express the view that, because of it, it would be well to consider whether we should "remain bound by the fetters of a mediæval doctrine, often regarded as having the institutional impregnability of an article of faith, which never had much, if any, justification."

Borchard, "Government Liability in Tort," Yale Law Journal, vol. 34, p. 3.

If our governments are to engage in corporate business, if the state is to undertake the construction of bathing beaches and amusement parks, if it is to own and operate in its highway work hundreds of trucks, is it still within the bounds of reason to say that, in doing those works, it can do no wrong, and that it is therefore immune to litigation sounding in tort?

The question is an economic one. Should for instance, a flagrant, wrongful violation by an employee of a state agency of the rights of an individual require that the whole loss be borne by that individual, who is himself without fault, or should the burden of the loss be distributed among the whole citizenship?

The state of Louisiana has, in enacting compensation laws, recognized that industrial accidents must occur, and it has adopted the policy that the loss which results from such inevitable accidents shall not be placed at the doors of the unfortunate individuals concerned, but must, through natural channels brought into play by the compensation laws, be distributed among the consumers, or, in other words, be charged back to the general public.

By reason of the application of the doctrine that the state is immune to tort actions, may incongruous results obtain. If the heads of the highway department have in mind the paving of two similar sections of road, and they decide that the department itself will pave one, but will let the other one out on contract to an independent contractor, and if, while the two jobs are in progress, A is killed by a highway truck and B is killed by a truck of the independent contractor, under conditions showing negligence on the part of the drivers, B's representatives may recover, but the members of A's family are told that, since the state may not be sued, they must stand

the loss themselves. Another incongruous situation presents itself when we consider that, if the highway department, in building roads, finds it necessary to send its trucks upon the farm of a nearby property owner and take his earth to build an embankment, it may be held liable for the value of the earth, Booth v. Louisiana Highway Commission, 171 La. 1096, 133 So. 169, but that if, in removing the earth, through the sole carelessness of a driver of one of the highway trucks, the landowner himself should be injured, or killed, no redress for his injuries or death could be had, because "the state can do no wrong."

The Supreme Court had no difficulty, under the written law, in announcing in the Booth case the doctrine stated—that the highway commission may be forced to pay for earth removed from the property of a nearby landowner, but, as the law presently exists, it seems that it would be impossible to render judgment in favor of the injured party should the hypothetical accident, which we have above described, actually occur. But the wisdom of economic policy is not for judicial consideration, and we feel that we are not privileged, and we know that we are not anxious, through the medium of judicial interpretation, to impose our views upon the people of the state.

The question which now confronts us was squarely presented to the Court of Appeal of the First Circuit in Kilberg v. Louisiana Highway Commission, 8 La. App. 441, and there our brothers of the other circuit, in holding that the Louisiana Highway Commission may not be held liable in tort, said:

"* * * No fault of an agent of the government can give cause for damages against the government when such agent is acting within the scope of his governmental powers."

. Counsel for plaintiffs is most industrious in his attempt to persuade us that certain uew points made by him are determinative of the question, and that we should not rest our view on the decision in the Kilberg case. For instance, he states that there is nothing in article 2315 of our Civil Code which excepts from its general provisions making everyone liable for the results of his fault the state or the state agencies or departments. The argument is interestingly presented, but general provisions of a codal article must yield to specific constitutional declarations, and we feel, as did Judge Leche, the author of the opinion in the Kilberg case, that such codal or statutory provisions "must be read in connection with the fundamental constitutional principle that the State may only be sued with its permission (section 35, art. 3), and where a State agency is acting within the scope of its governmental functions, it represents the State and as such, it may not be sued except with the permission of the State."

Another contention relied on by counsel is that the highway commission is an especially created political or departmental corporation, and that, as such, it may, under the act creating it, sue and be sued.

This argument, also, finds itself answered in the Kilberg case in the following words:

"It is evident from other provisions in the Act that the clause subjecting the Commission to the liability to be sued does not confer upon a complainant a right of action whereby the Commission would be eventually deprived and dispossessed of the fund which is necessary for it to exercise its governmental functions and which is dedicated by the Constitution to that special purpose. To so hold would be to recognize that the usefulness of the Commission can be destroyed and the purpose of its existence frustrated through the fault and negligence of the persons appointed to superintend the work necessary

to accomplish the legal ends of its existence.

"The funds under the control of the Highway Commission are specially dedicated to the construction and maintenance of highways and cannot be diverted from that purpose without express legislative sanction, and even if it were conceded that the Commission could be sued for damages ex delicto, a judgment for damages ex delicto would be worthless. Of course, courts of justice will not lend themselves to render judgments which cannot be enforced or executed.

"There is no reason why we should further construe the stipulation 'that the Commission is a body corporate and that as such it may sue or be sued.' It is not necessary for the decision of this case for us to express any opinion as to what actions may be brought against the Commission. Such opinion would be obiter dictum. Suffice it to say that we are clearly of opinion that the Louisiana Highway Commission may not be sued for damages ex delicto, and that therefore plaintiff's petition does not disclose a cause of action."

In analogous situations, various courts have held that, though a state may create a special corporation to perform particular governmental functions, and that, though in the statute creating such corporation or agency or department, it may be provided that the said creature may sue and be sued, nevertheless such provisions merely permit suits in contract and for special purposes, but do not constitute permission to institute actions for tort. Riddoch v. State, 68 Wash. 329, 123 P. 450, 42 L. R. A. (N. S.) 251, Ann. Cas. 1913E, 1033; Murdock Parlor Grate Co. v. Commonwealth, 152 Mass. 28, 24 N. E. 854, 8 L. R. A. 399; Houston v. State, 98 Wis. 481, 74 N. W. 111, 42 L. R. A. 39; Davis v. State, 30 Idaho, 137, 163 P. 373, Ann. Cas. 1918D, 911, 13 A. L. R. 1276; Burroughs v. Commonwealth, 224 Mass. 28, 112 N. E. 491, Ann. Cas. 1917A, 38; United States v. Cumming, 130 U. S. 452, 9 S. Ct. 583, 32 L. Ed. 1029; United States v. Irwin, 127 U. S. 125, 8 S. Ct. 1033, 32 L. Ed. 99.

That the solution cannot be found in the extension of the unsatisfactory early English rule that the offending or wrongdoing official, or employee, may be held liable, requires little discussion. Usually the offending employee has little or no financial responsibility and thus the injured party, although permitted to obtain a judgment, is unable to secure actual recompense for his loss. In many instances, too, it is essential that officials and employees be encouraged to exercise discretion and judgment, and it is manifestly not advisable that, in such case, if the official or employee be found to have been in error in the exercise of his sound discretion, he find himself subjected to the possibility of suits for damages.

Nor does it appear possible that a rule of liability consonant with economic wisdom, and enforceable similarly in all like cases, can come from the theory that the state should be held where the damage results from the doing of a corporate act, but not where it comes as a consequence of the performance of a governmental function.

In many jurisdictions it has been held that the work of repairing roads is corporate, whereas the building of roads requires the exercise of a governmental function. Hewitt v. Seattle, 62 Wash. 377, 113 P. 1084, 32 L. R. A. (N. S.) 632; Colorado v. Liafe, 28 Colo. 468, 65 P. 630; McMahon v. Dubuque, 107 Iowa, 62, 77 N. W. 517, 70 Am. St. Rep. 143; Wooster v. Arbenz, 116 Ohio St. 281, 156 N. E. 210, 52 A. L. R. 518; Bates v. Rutland, 62 Vt. 178, 20 A. 278, 9 L. R. A. 363, 22 Am. St. Rep. 95; Barney v. Lowell, 98 Mass. 570; Hennessey v. New Bedford, 153 Mass. 260, 26 N. E. 999; Wakefield v. Newport, 62 N. H. 624; Moore v. Luzerne County, 262 Pa. 216, 105 A. 94. Assuming, for the moment, that the distinction is sound, is it reasonable that the right of a person injured by a

public truck, through no fault of his own, shall exist if the truck is found to have been engaged in repair work, but not if it was engaged in construction work? Aside from the rather inequitable situation which may exist where one citizen is permitted to sue, and another, under what may seem to be identical facts, is denied recovery, it is usually extremely difficult to determine whether the work out of which the injury arose is governmental or corporate in character, and, in many cases, what has been held to be a corporate act by one court has been declared by others to be a governmental function.

Judge Benjamin N. Cardozo in, "A Ministry of the Law," vol. 35, Harvard Law Review, p. 120, says:

"It is a rule which has grown up in many jurisdictions and has become 'a common ritual' that municipal corporations are liable for the torts of employees if incidental to the performance or non-performance of corporate or proprietary duties, but not if incidental to the performance or non-performance of duties public or governmental. The dividing line is hard to draw.
" 'Building a drawbridge, maintaining a health department, or a charitable institution, confining and punishing criminals, assaults by policemen, operating an elevator in a city hall, driving an ambulance, sweeping and cleaning streets, have been held governmental acts. Sweeping and cleaning streets, street lighting, operating electric light plants, or water works, maintaining prisons, have been held private functions.'
"The line of demarcation, though it were plainer, has at best a dubious correspondence with any dividing line of justice."

That there should be a distinction between the results of the doing of corporate acts and the performance of governmental acts has been entirely rejected in some jurisdictions, notably in Ohio (see Fowler v. City of Cleveland, 100 Ohio St. 158, 126 N. E. 72, 9 A. L. R. 131), and it has been questioned by the Supreme Court of the United States in Workman v. Mayor, etc., 179 U. S. 552, in which we find that on page 574, 21 S. Ct. 212, 220, 45 L. Ed. 314, the majority of the court said:

"'* * * We must not be understood as conceding the correctness of the doctrine by which a municipal corporation, as to the discharge of its administrative duties, is treated as having two distinct capacities, the one private or corporate, and the other governmental or sovereign, in which latter it may inflict a direct and positive wrong upon the person or property of a citizen without power in the courts to afford redress for such wrong. That question, from the aspect of both the common and municipal law, was considered by this court in Weightman v. Corporation of Washington (1861) 1 Black, 39, 17 L. Ed. 52; Barnes v. District of Columbia (1875) 91 U. S. 540, 23 L. Ed. 440; and in District of Columbia v. Woodbury (1890) 136 U. S. 450, 10 S. Ct. 990, 34 L. Ed. 472. And although this opinion is confined to the controlling effect of the admiralty law, we do not intend to intimate the belief that the common law which benignly above all considers the rights of the individual, yet gives its sanction to a principle which denies the duty of courts to protect the rights of the individual in a case where they have jurisdiction to do so."

It is apparent that there has arisen, and that there is now on the ascendency, a tendency, in applying the doctrine of the immunity of the sovereign, to distinguish between the state itself and the various boards or departments now so numerous in all commonwealths. It is possible that a solution of the problem we have been discussing may lie in such distinction, which is shown to exist to some extent in Louisiana by a reading of the decision in Board of Commissioners of the Port of New Orleans v. Toyo Kisen Kaisha, 163 La. 866, 113 So. 127, 128, in which the Supreme Court, while recognizing the principle that prescription liberandi causa does not run against the state itself, said that it was nevertheless, operative against a

state department or board (Board of Commissioners of the port of New Orleans). The court used these words:

"* * * We are not prepared to hold that the exception thus established in favor of the state applies to any or all other public corporations or agencies. * * *"

Nevertheless, we do not feel that it is within our right or prerogative to overturn a principle of law which has, from a time almost beyond the memory of man, been firmly imbedded in our jurisprudence, and which seems to be based on the written laws of our state as they exist today. If it be desirable that there be adopted, instead of the doctrine of the immunity of the sovereign, some more democratic rule, it must be for the legislative branch of the sovereign state to so decide. The courts may only interpret and apply written laws as they are enacted by lawmakers, and, in such situations, as we have here considered, the difficulty really lies in the fact "that legislatures have been unwilling to re-examine the whole subject from the point of view of theory and history, in order to bring the law into harmony with the practical exigencies of modern life." Borchard, "Government Liability in Tort," Yale Law Journal, supra.

In discussing the question of the wisdom of following doctrines which are not consonant with the realities of life, Judge Cardozo, in "A Ministry of the Law," Harvard Law Review, supra, has this to say:

"The time is ripe for betterment. 'Le droit a ses epoques,' says Pascal in words which Professor Hazeltine has recently recalled to us. The law has 'its epochs of ebb and flow.' One of the flood seasons is upon us. Men are insisting, as perhaps never before, that law shall be made true to its ideal of justice. Let us gather up the driftwood, and leave the waters pure."

The judgment appealed from is affirmed.

HIGGINS, J., absent, takes no part.