GLADNEY, Judge.
This is one of three consolidated suits. Plaintiff brought this suit in tort alleging that on or about January 20, 1962, his property situated on Cross Lake was damaged by high water caused by the City of Shreveport in the operation of its flood gates which control the height of the water level on Cross Lake. The claims asserted are for reimbursement for expenses incurred in the repair and restoration of property above the 172-foot contour line which divides private property from that of the City along the water line of the lake. For cause of action the petitioner relies upon LSA-C.C. arts. 2315 and 667, the latter article embodying the legal maxim, sic utere tuo, ut alienum non laedas (so use your own, that you injure not another’s property). The City of Shreveport filed exceptions of no cause and no right of action and joined issue through the filing of its answer which denied any damages sustained by the petitioner were occasioned by it. The exceptions were referred to the merits and the cause submitted to the trial court upon depositions in affidavit form and exhibits attached to the deposition of Charles B. Foster, Jr., engineer of the Department of Water and Sewerage of the City of Shreveport, which included a map depicting the location of the dam at the eastern end of the lake and the location of the property involved in the suit. The other exhibit consisted of hydrology reports of Cross Lake disclosing the true measurements of the level of the lake, without taking into account any wind or wave action, as daily recorded from January 1, 1962 through December 31, 1962. At the foot of this chart is reflected the rainfall or precipitation on the watershed as measured daily during the calendar year 1962. With written reasons the judge a quo rendered judgment favorable to the petitioner and the City of Shreveport has appealed.
The principal contention of the petitioner is that by its regulation of the flood gates the City became responsible for damages sustained by his property above the 172-foot contour line which damage was caused by the action of the waters of Cross Lake; and that such injury could and should have been avoided by maintaining the level of the lake at a stage whereby the damage would not have occurred. By way of answer to this postulation, the City asserts that at no time during the period complained of did the mean water level *382 of the lake rise above the 172-foot contour line and its records show that the highest stage so reached occurred on January the 17th when it measured 171.62 feet; that the defendant acted within its rights in maintaining the level of the lake below the 172-foot contour marker; and that it is necessary to secure a “full” lake, not below 171.20 feet, to insure a sufficient supply of water to the City of Shreveport during the dry summer months. The figure 171.20 feet is relied upon forasmuch as the concrete crest of the dam is at an elevation of 168.13 feet above mean Gulf level, which makes the top of the concrete impounding dam 3.07 feet lower than the top of the three gates, which is 171.20 feet.
The appellant City of Shreveport, however, has in nowise abandoned its exceptions of no cause and no right of action which are urged upon this appeal. The exceptions are grounded upon: (1) a plea of governmental immunity, (2) an absence of any specific allegations of negligence, (3) an improper basis for the assessment of damages, and (4) that plaintiff’s petition fails to allege any act of trespass by the waters of Cross Lake, in that they arose above the 172-foot contour line brought on by the actions of the defendant; and that if defendant should be forced to lower the lake level several feet below the 172-foot contour line in order to insure appellee’s property against acts of God such as wind-created waves, such lowering of the water would constitute an extremely dangerous hazard to the public health, welfare and •safety of the citizens of Shreveport since •Cross Lake is the sole source of water for •the City of Shreveport.
In order to give a full measure of consideration to the issues herein presented •and more particularly to the important question of the immunity vel non of the City •of Shreveport from this type of lawsuit, we find it necessary to state more or less in detail the historical background with respect to the creation of Cross Lake as a reservoir or source of water supply for and under the control of the City of Shreveport.
The Supreme Court of Louisiana in State v. Bozeman, 156 La. 635, 101 So. 4 (1924), held that Cross Lake was navigable at the time of the admission of Louisiana into the Union and that the State of Louisiana acquired title to the bed of the lake by virtue of her sovereignty below the ordinary high water mark at an elevation of 172 feet above mean Gulf level, this conclusion having been reached by the United States Department of Interior after an investigation. In discussing the navigability of the lake the decision reports the following information which we consider relevant to the question at hand:
“Cross Lake was one of a chain of lakes which came into existence through the formation in Red river of what is historically known as the ‘Great Raft.’ The other lakes were designated by the names of Sodo, Ferry, and Clear. These lakes were created some time between the years 1770 and 1790. The formation of the raft began in the latter part of the fifteenth century near the present mouth of Red river. It gradually grew in size until it was many miles long. By reason of decay at its downstream end and additions to its upstream end the raft actually proceeded up stream, although its progress was necessarily slow. In about the year 1780 the raft reached a point in Red river where its obstruction of the waters of said river caused them, in turn, to block the outlet of Cross bayou, thereby constituting a dam which resulted in the creation of Cross Lake. The lake occupied the valleys of Cross bayou and Paupau creek, covered approximately 10,000 acres of land, and became the storage basin of a drainage system draining an area of about 300 square miles.
⅜ ⅜ ⅜ * ⅜ *
“The removal of the raft, which was completed in 1873, together with the *383 extension of the levee system, and the improved drainage of Red river, caused the waters of the lake to recede to such an extent that at the present time the outlet of the lake drains out all but about two feet of water in its deepest part. During the summer months the remaining water dries up, so that for several months of each year the lake becomes ordinary dry land.”
The deposition of petitioner Hamilton without other elaboration simply states that the level of Cross Lake did rise above the 172-foot contour line on more than one occasion during 1962. Similar statements were also made in the depositions of William Joseph Hunter, W. Scott Wilkinson, and Mrs. Lavada Smith Tracy. It is indicated that these conclusions were predicated upon the observations of debris and erosion by these deponents with respect to the property above the 172-foot contour line. The deposition of Charles B. Foster, Jr., describes the Cross Lake dam as consisting of an earth fill dam upon which are located certain railroad tracks; and that the dam extends to the spillway where are located the gates which control the water of Cross Lake. He testified that it became necessary to replace the gates due to the fact that they were extremely difficult and dangerous to operate and could only be operated during the daytime and then manually under adverse conditions; that in 1960 the City' contracted for the installation of new mechanical crest gates which could be operated virtually on a push-button procedure; that after the fabrication of the gates, on September 12, 1961, the lake was lowered purposely to a level of 169 feet for purposes of construction and maintained at this stage until January IS, 1962; that the gates are three in number and are termed lateral gates, that is, they lie alongside of each other; that any one of the three can be raised individually or two can be raised together, or all three can be raised together, and the raising or lowering of the gates can now be done quickly and immediately; and that under the supervision of deponent a chart or graph has been kept for each year in rela-tion to the height of ■ the lake daily. He testified: “That on the 15th day of January, 1962, gates 1 and 2 were opened and the level of the lake at that date was 171.52 feet; that on the 23rd day of January, 1962r the height of the lake was 170.45 feet and' rose to 171.01 feet on the 24th day of January. On the 25th day of January the height of the lake was 171.52 feet, and gates; 1 and 2 were then opened on that day. The-lake dropped to 171.38 feet on the 26th day of January and to 171.36 feet on the 27th. day of January. On the 28th day of January,, gates 1 and 2 were closed, and the lake was-at 171.36 feet; that on the 29th day of January, the lake was at 171.38 feet when gate-number 2 was opened. On the 30th day of January, the lake was at 171.43 feet, on: which date gate number 2 was closed. On the 31st day of January, the chart reveals-that the lake was 171.48 feet and the chart, as marked and attached hereto D-2, reveals-that during the month of January, March and April, it fluctuated slightly but never went above 171.62 and began to lower along the latter part of April of 1962.
“Further, the highest point during the-month of January of 1962, as measured onD-2, was reached on the 17th day of January when the lake was measured at 171.62! Following the months of April and May and along towards the end of June in 1962, D-2' reveals that the lake level took a definite-downward trend during the summer.” Foster further stated that inasmuch as Cross Lake is approximately eight miles long running in an easterly and westerly direction-with the dam being at the eastern end of the-said lake, the measurements taken at the-height of the dam will not vary any more than a tenth of a foot from the measurement of the water level of the lake, a mile,, two miles or four miles from the dam.
Title of the City of Shreveport to the bed of Cross Lake below the 172-foot contour line is derived from the State of Louisiana-The State Legislature through Act No'. 31 of 1910 authorized the lands known as the *384 "bed of Cross Lake and as particularly described, to be conveyed to the City of Shreveport to be used by it as a reservoir •or storage basin for water to be used by said City for the purpose of supplying itself and its citizens with a good and wholesome supply of water. In 1920 through Act 149 of the Legislature provided that should the City fail to utilize the bed of Cross Lake for the purposes specified in Act No. 31 ■of 1910 that said land would revert to the State of Louisiana. Subsequent to 1920, however, the City did in fact establish Cross Lake as a source of its water supply. Through Act 39 of 1926 the City of Shreveport was authorized to exercise and enforce police and sanitary regulations and ordinances over the waters of Cross Lake and the area surrounding same with its tribu-, taries for a distance of 5,000 feet from the 172-foot mean Gulf level water line of said lake for protection from pollution and contamination of its water supply. It should be mentioned that at one time the City of Shreveport received- water from Cross Bayou through a pipeline but this source ■of water has been long since abandoned except occasionally it is resorted to for the purpose of raising the waters of Cross Lake but only when the water level of the lake is so extremely low as to endanger the water supply.
The City argues that an action ex •delicto does not lie against a municipality for offenses or quasi offenses committed by its agents or employees while engaged in the performance of purely governmental functions such as the operation and maintenance of its flood gates on Cross Lake in order to insure an adequate water supply for the City of Shreveport. This contention has merit and in our opinion controls our decision. As pointed out hereafter the State of Louisiana has given its approval to the doctrine so stated and has not looked with favor upon exceptions to the general rule. The acquisition and distribution of a supply of water for the needs ■of a modern city involves, we think, the •exercise of governmental functions. The water which the City of Shreveport obtains from Cross Lake is essential to public schools, public sewers so necessary to preserve health, fire departments, street sprinkling and cleaning, public buildings, parks, playgrounds and other essential municipal services which could not exist except for an adequate and wholesome water supply.
As frequently urged when the question of governmental immunity arises, it is argued herein that by supplying water to its inhabitants the City is engaged in selling water for profit and because of this the operation must be stamped as being private and not governmental in character. In discussing this objection, the Supreme Court of the United States in Brush v. Commissioner of Internal Revenue, 300 U.S. 352, 373, 57 S.Ct. 495, 501, 81 L.Ed. 691, 700 (1937) observed that the overhead due to the enormous cost of a city water system and the fact that so large a proportion of the water is diverted for public use, these facts plainly suggest that no real profit is likely to result from the sale of water and that the City is rendering a service rather than selling a commodity. It can be pointed out that many of such public services such as bridges along highways, public schools, the federal post office services, and other governmental functions make certain charges without resulting in the services becoming private merely because a charge is made. It will be noted also that Cross Lake itself is used for many other public purposes besides being the sole source of Shreveport’s water supply.
We think that the rule of government immunity must and should be applied in the instant case. Reaching this conclusion, we find our opinion is fortified by the weight of authority in this State. The decisions are so numerous we find it unnecessary to go beyond those cited in Barber Laboratories v. City of New Orleans, 227 La. 104, 78 So.2d 525, 526 (1955), which include:
“Yule v. City of New Orleans, 25 La.Ann. 394, City of New Orleans v. Kerr *385 [Ker] and Gally, 50 La.Ann. 413, 23 So. 384, Planters’ Oil Mill v. Monroe Water Works & Light Company, 52 La. Ann. 1243, 27 So. 684, Joliff v. City of Shreveport, 144 La. 62, 80 So. 200, Howard v. City of New Orleans, 159 La. 443, 105 So. 443, Taulli v. Gregory, 223 La. 195, 65 So.2d 312, Prunty v. City of Shreveport, 223 La. 475, 66 So.2d 3.”
To these should he added State ex rel. Porterie v. Walmsley, 183 La. 139, 162 So. 826, 842 (1935) and Beck v. Boh Brothers Construction Company, La.App., 72 So.2d 765 (4th Cir. 1954); and Barnett v. City of Monroe, La.App., 124 So.2d 249 (2nd Cir. 1960). Our attention, however, has been called to the case of Hicks v. City of Monroe, 237 La. 848, 112 So.2d 635 (1959) which was appealed from this court (108 So.2d 127), the Supreme Court adopting in toto the opinion of the Court of Appeal. Therein the court pointed out that the position of the defendant municipality was the same as that of a private corporation engaged in the same business and in consequence a plea of governmental immunity from suit would not be recognized. The Hicks case was a suit by residents of an area outside the city limits, and against the City as the operator of a municipal water plant and electric distributing system, seeking a judgment decreeing the illegality of increased rates for water service to residents who were 'not also taking the municipality’s electric service. The court was not dealing with an offense or quasi offense. And the case is inapposite forasmuch as it applies to a judicial determination of a contractual matter whereas in the instant case the action arises in tort. It seems proper to notice also the argument advanced in plaintiff’s brief that LSA-C.C. art. 667 should have application to a municipality rather than LSA arts. 491 and 668 in accord with Hauck v. Brunet, La.App., 50 So.2d 495 (Orl.1951). This pronouncement, however, was repudiated by Judge Janvier in Beck v. Boh Brothers Construction Company, supra, wherein he commented:
“Surely the redactors of the Civil Code did not intend to apply this article to a municipality. In the first place, the City is not the ‘owner’ of its streets in the same capacity as in the owner of a private property. The citizens themselves are the owners of the street. In Town of Napoleonville v. Boudreaux, La.App., 142 So. 874, 875, the Court said:
“ ‘A street thus established by a municipal corporation becomes public property belonging to all in common. * * ⅝ >
“ ‘This street, when thus established, was segregated from the individual ownership, and became the property of all in common.’
“See, also, Irwin v. Great Southern Tel. Co., 37 La.Ann. 63.
“We agree with counsel for the Sewerage & Water Board that it would be very drastic to extend the doctrine of the Hauck v. Brunet case so as to include the Sewerage & Water Board, or the City of New Orleans, or any other political subdivision as a ‘neighbor’ within the contemplation of the quoted article of the Code. Should that be done municipalities would be placed in a very desperate situation since, whenever work is done by them, they would be overwhelmed with suits similar to that which we are now considering. See Orgeron v. Louisiana Power & Light Co., 19 La.App. 628, 140 So. 282.
“Our conclusion is that the exception of the City of New Orleans was also properly maintained.”
It follows that if article 667 has no application to a municipality it appears very doubtful that plaintiff has established a cause of action ex delicto for his pleadings do not reflect any specific ground of negligence. However, we will not belabor our decision further for we are of the opin *386 ion that appellant’s plea of governmental immunity is meritorious and should he sustained.
It follows therefore that the judgment appealed from should he annulled and reversed and accordingly plaintiff’s demands are denied at his cost.
On Rehearing
The original opinion stated:
“The City argues that an action ex delicto does not lie against a municipality for offenses or quasi offenses committed by its agents or emploj'ees while engaged in the performance of purely governmental functions such as the operation and maintenance of its flood gates on Cross Lake in order to insure an adequate water supply for the City of Shreveport. This contention has merit and in our opinion controls our decision. * * * ”
In his application for rehearing appellee has reaffirmed his contention that the City of Shreveport is not entitled to governmental immunity, from actions for damages arising from the maintenance and operation of the Cross Lake flood gates. Appel-lee’s argument is that the functions involving the lake are incidental to the services of the City in its sale of water and therefore falls within the recognized rule that functions of a proprietory character are not embraced within the rule of governmental immunity.
We are not disposed to accept this postulation. The origin and source of the City’s title to Cross Lake and its usage of water derived from that source for general municipal purposes were narrated in our original decree. Therein we observed that water is essential to public schools, public sewerage so necessary to preserve health, fire departments, street sprinkling and cleaning, public buildings, parks, play grounds and other municipal services that could not be supplied and furnished to its citizens without an adequate and wholesome water supply. Directing out attention to the distinction between governmental functions and those of a proprietory character, counsel for appellee has quoted from 38 Am.Jur., § 268, p. 269:
“ * * * Among instances in which a municipality exercises governmental powers are the making and enforcing of police regulations for the prevention of crime, the preservation of public health, the protection of property, the caring for the poor, and the education of the young. As an example of the exercise of proprietary functions may be mentioned the operation of public utilities such as electric, gas, or water plants, for the benefit and convenience of the inhabitants. * * * ”
Concededly, the jurisprudential rule as stated does have widespread application in Courts other than those of Louisiana, we do find that the Courts of this State have not given their approbation of the application of the legal principle in the exercise of municipal functions relating to the use of its water supply. Our examination of the authorities at hand justifies some comment with respect to State ex rel. Porterie v. Walmsley, 183 La. 139, 162 So. 826, 842 (1935) and Beck v. Boh Bros. Const. Co., La.App., 72 So.2d 765. (Orleans Appeal 1954). The Supreme Court found it necessary in State ex rel. Porterie v. Walmsley to inquire whether or not the operation of the sewerage, water and drainage system of the City of New Orleans were “ordinary governmental functions of municipal government.” Observing that the board had been created for the purpose of avoiding a repetition of malaria, typhoid, and yellow fever epidemics the State Legislature enacted legislation for its creation as a sanitation and health measure, declaring it was a matter that affected the general welfare and health of the people throughout the State. The author of the Supreme Court-decision commented:
“The water supply, drainage, and sewerage disposal of New Orleans is handled by the sewerage and water board; the state police power is involved, since *387 it has the right to protect the general public from pestilences, epidemics, contagious diseases such as malaria, typhoid, and yellow fevers, thereby promoting the public weal. Medical science has definitely determined that yellow, typhoid, and malaria fevers are caused by germs and insects bred and propagated as a result of improper drainage, inadequate and faulty sewerage disposal, and contaminated drinking water. In order to avoid the further repetition of the spread of those diseases, the water supply, sewerage disposal, and drainage of the city was placed with the sewerage and water board. The prevalence of these maladies had caused general quarantine, paralyzing public and private business and causing general public loss.”
And continuing said:
“So, it would seem that the operation of the sewerage and water board controlling the drainage, sewerage, and water systems of the city of New Orleans is not an ordinary governmental function of the municipal government. It vitally concerns and affects the health and lives of the people through-nut the state. The operation of this board is the performance of a governmental function delegated to it by the sovereign state. This is the interpretation that has been placed upon the duties and functions that it performs by the board itself.
■“In several cases where citizens sued the sewerage and water board for damages for personal injuries said to have resulted from the negligence and carelessness of its officials, agents, or employees, this board has pleaded exemption from tort liability on the ground that it was engaged in the performance of a governmental function as distinguished from a municipal function. Manguno v. City of New Orleans (La.App.) 155 So. 41, at page 46; Rome v. London & Lancashire Ind. Co. of Am. (La.App.) 156 So. 64. This court refused writs in both of these cases.”
[State ex rel Porterie v. Walmsley, 162 So. 842, 843] Beck v. Boh Bros. Const. Co. involved the sewerage and water board of New Orleans, the contractor for which was sued in tort for damages alleged to have resulted from vibrations of the company’s excavation equipment, the particular operation involving the construction of a concrete drainage canal in the city street." The Court held that the operations of the sewerage and water boards in the construction and maintenance of drainage canals are purely governmental and not in any sense proprietory. Counsel for appellee briefly observes that this operation was carried on pursuant to the function of the board to provide drainage for the city as a health measure and did not involve the operation of a water works system in any respect. We are not impressed with the comment.
We likewise conclude that the operation and maintenance of the water level of Cross Lake and the furnishing of a supply of wholesome water for the many municipal functions which have been classified by our Courts as being of a purely governmental character, does not constitute an exercise by the municipality of a proprietory function.
We have not been referred to any additional authorities on this application that were not considered when the original hearing was before us. However, because the operations upon Cross Lake are so disconnected from the sale and delivery of water by the City to its citizens we find it unnecessary to comment upon the tort liability of the City, arising from its distribution of water for sale.
For the reasons hereinabove stated our original opinion is reinstated and made the judgment of this Court.