ROME v. LONDON & LANCASHIRE INDEMNITY CO. OF AMERICA.*

No. 16343.

Court of Appeal of Louisiana. Orleans.

June 22, 1936.

*Rehearing denied Oct. 5, 1936. Writ of certiorari refused Nov. 4, 1936.

134

C. Ellis Henican, of New Orleans, for appellants.

Miller, Bloch & Martin, of New Orleans, for appellee.

McCALEB, Judge.

This is the second time this court has had occasion to consider this case.

Mr. and Mrs. Nicholas Rome brought the suit in the civil district court for the parish of Orleans against the London & Lancashire Indemnity Company of America, the insurance carrier of the New Orleans City Park Improvemeunt Association, under the provisions of Act No. 55 of 1930, claiming damages because of the wrongful death of their son, Allen Rome, a minor 10 years of age.

It is alleged that on Saturday, June 3, 1933, plaintiffs' minor son went to the swimming pool in the city park of the city of New Orleans, paid the customary entrance fee of 25 cents which entitled him to bathe in said swimming pool; that he was unable to swim; that, about ten minutes to twelve on said day, his body was found lifeless on the bottom of that part of the pool where the water was 9 feet in depth; and that his death resulted from drowning and not from any other cause.

It is charged that the drowning of plaintiffs' son was caused through the negligence of the New Orleans City Park Improvement Association, the owner of the pool, due to their faulty management and operation of the pool, in that:

(1) There were more people using the pool than was customary; that the operators of the pool knew or should have known that there would have been more than the customarily anticipated crowd of bathers; and that, notwithstanding, the operators did not supply an extra crew of life guards to watch over the persons bathing in the pool.

(2) That the life guards who were on duty did not attend to their tasks, as ordinarily prudent life guards would have done, considering the number of persons using the pool on that day.

(3) That the life guards saw or should have seen plaintiffs' son in distress prior to the time he lost his life in the said pool and that they did nothing to save him.

(4) That if the life guards had been vigilant, as they should have been, the plaintiffs' son would not have lost his life by drowning.

(5) That the point, at which plaintiffs' son's body was found, was not more than 10 feet away from one of the platforms on which a life guard was supposed to be stationed, and that if he had been alert, he would have discovered plaintiffs' son before the child was drowned.

It is further alleged that the New Orleans City Park Improvement Association operated the swimming pool in their proprietary capacity and for profit and did not exercise a governmental or public function in so doing. It is further alleged that prior to the date of the accident, the New Orleans City Park Improvement Association caused a policy of insurance to be issued by the defendant; that the said policy was in force and effect at the time of the accident; and that the defendant agreed to indemnify the insured against loss, by reason of liability imposed upon it, for damages on account of death or bodily injuries suffered by any person or persons, not employed by the insured, as a result of an accident occurring during the policy period.

Judgment was prayed for against the defendant in the sum of $10,000, which is the limit of the defendant's liability under its contract of insurance with the New Orleans City Park Improvement Association.

To this petition an exception of no right or cause of action was filed which was sustained by the district court.

On appeal, this court, on first hearing, reversed the judgment maintaining the exception and remanded the case for trial on its merits. See Rome v. London & Lancashire Indemnity Company, 156 So. 64.

The opinion was written by Mr. Justice Higgins, who was, at that time, a member of this court. Subsequently, a rehearing was granted and the first opinion and decree was recalled and there was judgment affirming the action of the district court in maintaining the exception of no cause of action. (La.App.) 157 So. 175. The plaintiffs thereupon applied for and obtained from the Supreme Court a writ of certiorari, and the Supreme Court reversed the second judgment of this court, overruled the exception of no cause of action, and approved the opinion of Mr. Justice Higgins (which had been handed down by this court on first hearing), and remanded the cause for trial on the merits. 181 La. 630, 160 So. 121.

After the record was returned to the district court, the defendant answered. The answer, in substance, denies all of the allegations of the petition, except that it admits that the plaintiffs' minor son was drowned in the said pool on June 3, 1933. It avers that plaintiffs' son had been forbidden by his parents to enter the swimming pool, and that he did so in direct disobedience to their orders, and was, therefore, guilty of contributory negligence. It also asserts that before the pool closed on the day of the accident plaintiffs' son, together with his playmates, left the pool; that the plaintiffs' son re-entered the pool after it was closed, and that, about 12:30 p. m., when the pool attendants learned from the companions of plaintiffs' son that he was missing, they at once discovered his body on the bottom of the pool, retrieved it, and made all possible efforts to revive the boy.

The answer further sets forth that the swimming pool is the property of the state of Louisiana and was being operated by the New Orleans City Park Improvement Association solely as the agent of the state and not for profit or as a private or proprietary function.

On these issues the case was tried and, at the conclusion of the hearing, the district judge found for the defendant on the following grounds:

(1) That the evidence shows that the New Orleans City Park Improvement Association is a corporation operated for the benefit of the public; that the swimming pool is conducted by it in its capacity as an arm of the government and not for profit; and that, accordingly, under the jurisprudence, it is not liable for the negligence of its agents or servants.

(2) That inasmuch as the New Orleans City Park Improvement Association may not be held in damages, the defendant, its insurance carrier, is likewise exonerated from liability; and

(3) That the plaintiffs failed to show that the New Orleans City Park Improvement Association was guilty of any negligence proximately causing the death of Allen Rome.

Wherefore this appeal.

At the threshold of this suit the question arises whether the New Orleans City Park Improvement Association is operating the swimming pool for profit, or in the performance of a governmental function.

■ Our decision on the law is controlled by the opinion of Mr. Justice Higgins in this case on exception of no cause of action (156 So. 64), which was approved by the Supreme Court on writ of certiorari (181 La. 630, 160 So. 121).

■ Under Act No. 130 of 1896, § 3, it is provided that the duty of this association shall be to take charge and supervision of city park and its preservation for public recreation, to its gradual improvement and ornamentation as a place of resort and pleasure of the citizens of New Orleans.

The facts disclosed by the evidence of Mr. Dabezies, chairman of the swimming pool committee, is that the swimming pool is not conducted for profit, but makes a charge to patrons merely for the purpose of paying the operating expenses of the pool.

Under these circumstances, it follows that the City Park Improvement Association may not be sued for the torts committed by its employees while engaged in this public pursuit. We are of the opinion, however, that the exemption from liability afforded to the City Park Improvement Association is not properly based upon the doctrine that "The King can do no wrong." Under article 3, § 35, of the Constitution of 1921, the state of Louisiana may only be sued with its permission, but it cannot be plausibly argued that the New Orleans City Park Improvement Association is the state. In truth, it is no more than a quasi public institution, created by private charter with the consent of the Legislature. It has been made a subdivision of the municipal corporation of the city of New Or-

leans, with supervision over the city park, and the city of New Orleans each year provides a fund, placed at the disposal of the association, for the upkeep of the park. Hence, it cannot be successfully contended that this association is the sovereign state of Louisiana and that the constitutional immunity from suit applies to it. However, it is exempt from liability in a suit involving its negligence while in the performance of governmental. functions. The theory of governmental immunity has been recognized by this court and the Supreme Court in a number of cases and is ably set forth by Judge Janvier in the case of Orgeron v. Louisiana Power & Light Company et al., 19 La.App. 628, 140 So. 282, 285, where it is said:

"In analogous situations, various courts have held that, though a state may create a special corporation to perform particular governmental functions, and that, though in the statute creating such corporation or agency or department, it may be provided that the said creature may sue and be sued, nevertheless such provisions merely permit suits in contract and for special purposes, but do not constitute permission to institute actions for tort. Riddoch v. State, 68 Wash. 329, 123 P. 450, 42 L.R.A.(N.S.) 251, Ann.Cas.1913E, 1033; Murdock Parlor Grate Co. v. Commonwealth, 152 Mass. 28, 24 N.E. 854, 8 L.R.A. 399; Houston v. State, 98 Wis. 481, 74 N.W. 111, 42 L.R.A. 39; Davis v. State, 30 Idaho, 137, 163 P. 373, Ann.Cas.1918D, 911; 13 A.L.R. 1276; Burroughs v. Commonwealth, 224 Mass. 28, 112 N.E. 491, Ann.Cas.1917A, 38; United States v. Cumming, 130 U.S. 452, 9 S.Ct. 583, 32 L.Ed. 1029; United States v. Irwin, 127 U.S. 125, 8 S.Ct. 1033, 32 L.Ed. 99."

The reason for this rule is that it is against public policy to divert the money of the taxpayers, dedicated for a specific purpose, to the payment of damages for redress of injuries to an individual caused through the negligent operation of the public function. This rule of exemption from liability is severely criticized by numerous authorities, all of which are set forth in the Orgeron Case, supra. Be that as it may, the immunity universally exists and, therefore, the New Orleans City Park Improvement Association is not liable to the plaintiffs.

If the association is exempt from liability, can its paid insurance carrier, the defendant in this case, avail itself of that defense?

It is claimed by counsel for defendant that the question was decided in his favor by this court in the case of Loustalot et al. v. New Orleans City Park Improvement Association et al., 164 So. 183, 185. However, in our opinion, the Loustalot Case should be overruled for the reason that it misinterprets the decision of the Supreme Court in Edwards v. Royal · Indemnity Company, 182 La. 171, 161 So. 191, where a different result was reached. Aside from this, we believe that the Loustalot Case was incorrectly decided for the reasons which will be hereinafter set forth. It is to be noted that the unsuccessful party in the Loustalot Case did not apply to the Supreme Court for a writ of review.

■ Under article 2315 of the Civil Code, which governs the question of liability in this case, there is no exemption created in favor of municipal, public, charitable, or eleemosynary corporations. This fact was recognized by us in the case of Bougon v. Volunteers of America et al., 151 So. 797, 798, wherein it is said:

"Under the articles of our Civil Code and under the common law as well, an individual is bound to make compensation for his negligent acts causing damage to others, whether his motives be charitable or otherwise. He is also obliged to compensate the recipient of his charity for an injury received in its negligent performance. If he undertakes to act through others, his employees, the situation is not changed; 'Qui facit per alium facit per se.'"

As heretofore observed, the only reason why the City Park Improvement Association should be immune from liability is upon the ground that it will result in a diversion of the public funds which are dedicated for a specific public purpose.

■ But the association in this case has seen fit to protect all persons who may be hurt as a result of its negligent operation of the city park by taking out a policy of liability insurance. And, under the provisions of Act No. 55 of 1930, the Legislature has accorded to the injured party a direct cause of action against the insurance company. Undoubtedly, the defense of immunity from suit is personal to the association for the same reason that the defense of minority can only be pleaded by a minor.

The insurance carrier in this case is the surety for the New Orleans City Park Improvement Association, agreeing "to indemnify the assured against loss by reason

of the liability imposed upon him by law for damages on account of bodily injuries, including death. * * *"

Article 3060 of the Revised Civil Code, which treats of the defenses which may be set up by the surety, reads:

"The surety may oppose to the creditor all the exceptions belonging to the principal debtor, and which are inherent to the debt; *but he can not oppose exceptions which are personal to the debtor.*" (Italics ours.)

And again, in article 2098 of the Revised Civil Code, it is provided:

"A codebtor in solido, being sued by the creditor, may plead all the exceptions resulting from the nature of the obligation, and all such as are personal to himself, as well as such as are common to all the codebtors.

*"He cannot plead such exceptions as are merely personal to some of the other codebtors."* (Italics ours.)

The Supreme Court, in Edwards v. Royal Indemnity Company, supra, considered the foregoing articles of the Code in connection with Act No. 55 of 1930, and, 182 La. 171, on pages 177 and 178, 161 So. 191, 193, of the opinion, it said:

"It will be noted that Act No. 55 of 1930 has no repealing clause, and, therefore, cannot be said to repeal in any way article 2098, R.C.C. Under the express provisions of Act No. 55 of 1930, the insurance company is liable in solido to the claimant. This article provides that a codebtor in solido, when sued by the creditor, may plead all exceptions resulting from the nature of the obligation. The last sentence of the article expressly provides that an in solido debtor cannot plead such exceptions as are merely personal to some of the other codebtors in solido."

And further, in the opinion, 182 La. 171, on pages 180 and 181, 161 So. 191, thereof, the court, in speaking of the case of Vitale v. Checker Cab Company, 166 La. 527, 117 So. 579, 59 A.L.R. 148, observed:

"It seems clear to us that the views expressed in Vitale v. Checker Cab Co., supra, are sound, because the defense of contributory negligence arose out of the accident. But that decision does not go so far as to hold that *where the defense is purely a personal one, i. e., minority, interdiction, coverture, or that it is contrary to the articles of the Civil Code of this state for a minor to sue his father for damages, or a wife to sue her husband in tort, that the insurance carrier or a joint tort-feasor, who was liable in solido, has the right to interpose or urge such defenses against the claim of the minors or the married woman for damages for personal injuries negligently caused by the father and husband, respectively."* (Italics ours.)

It is too plain for extended argument that the defense of immunity from liability because of the engagement in the operation of a governmental function is one which is purely personal to the public corporation. The exemption is based on reasons of public policy, and, where the public body deems it wise to nevertheless protect the people by insuring its activities against negligence in the operation thereof, it is manifest that to allow the paid insurance carrier to escape liability on such a ground would be to accomplish a miscarriage of justice.

The defendant has received from the New Orleans City Park Association a valuable consideration. If the defense of immunity from suit is available to it in this case, this insurance company is, in truth and in fact, receiving public moneys without consideration, for we cannot imagine any case sounding in tort which might successfully be prosecuted against it under the insurance contract.

We believe that, while it is against the public policy of the state to allow the New Orleans City Park Association to be sued in tort, it is equally against public policy, common sense, and inapposite to the intention of the Legislature, as reflected by Act No. 55 of 1930, to allow the defendant insurance company to escape liability on the ground contended for.

This court, in the Loustalot Case, seeks to justify the decision exonerating the paid insurance carrier by pointing to the fact that when this case was decided by the Supreme Court on an exception of no cause of action, Mr. Justice O'Niell concurred in the opinion of the court, stating that:

"I consider it a sufficient answer to the plea which is set up in defense of this suit that the suit is brought against the insurer alone."

Because of that concurring opinion, this court reasoned, in the Loustalot Case, that the majority opinion rejected the views of Chief Justice O'Niell. But, upon reflection, we do not now consider the opinion of the Supreme Court in that light. The questions presented to the court on exception of no cause of action were:

(1) Whether the City Park Improvement Association was liable for its torts where the swimming pool was operated for profit, and

(2) Whether, in any event, the insurance carrier could avail itself of such a defense.

The majority of the court merely held that the association would be liable because the allegation of the petition, taken as true, was that the operations were conducted for profit, without expressing any view on the second proposition. Chief Justice O'-Niell said that in his opinion it did not make any difference whether the association could be sued or not, for, in any event, the insurance carrier was liable.

The opinion in the Loustalot Case seeks to distinguish the case of Edwards v. Royal Indemnity Company, supra, by quoting from the opinion of Chief Justice O'Niell in Ruiz v. Clancy, 182 La. 935, 162 So. 734, wherein the Chief Justice discussed the holding of the court in the Edwards Case. But the remarks of the Chief Justice in Ruiz v. Clancy, supra, are really obiter dicta, because in that case the court held that Lochbaum, the assured under the policy with Clancy, was liable, and for this reason it was not necessary to the decision for comments to be made on the holding in the Edwards Case. In any event, the conclusion reached in the Edwards Case is that, under the provisions of Act No. 55 of 1930, the insurance carrier cannot set up defenses purely personal to the insured not growing out of, or connected with, the accident or the policy.

For the foregoing reasons, we are of the opinion that the Loustalot Case should be overruled and that the defense of exemption from liability of the insured for its torts is a defense distinctly personal to the New Orleans City Park Improvement Association which may not be invoked by the defendant insurance carrier in this case.

Having determined that defendant is responsible for the negligent acts of the New Orleans City Park Improvement Association under the insurance policy, and that the defense of the immunity of the association from suits in torts is not available to it, we now contemplate the question of negligence on the part of the employees of the swimming pool.

The plaintiffs maintain that this case falls within the doctrine of res ipsa loquitur. Prescinding the question of the application of the doctrine, it is pertinent to state the facts disclosed by the record.

In order that the story of this unfortunate occurrence may be intelligently portrayed, it is necessary to describe the scene of the accident.

The swimming pool is located in the city park of New Orleans and is situated in the rear of a one story building about 75 feet wide by 175 feet in length. The pool is inclosed by a wire fence approximately 10 feet in height, in order that persons, other than bathers, may be excluded. The only way by which one may gain admission to the swimming pool is by going through the front entrance and passing the cashier's window. Looking across the pool, at the rear end of the building, one will see on the left-hand side the door to the ladies' locker room, on the right-hand side the door to the men's locker room, and a first-aid room, which is also occupied by the manager, a life guards' lavatory, and in the middle of the building, the engine room with a supply room slightly to the left thereof. Directly over the engine room is a large clock. A person proceeding from any of the doors, abutting the pool, will enter onto a concrete terrace from which there are steps which take one into the pool. The pool itself is of oval shape and on each end is a cascade with steps on either side which lead into shallow water. It is 200 feet in length and its width, through the middle, is 75 feet. It is divided longitudinally into three parts, and the two end parts contain shallow water and are identical in shape and dimensions. This shallow water is generally used by bathers who are unable to swim and small children. The middle of the pool is separated from the shallow water by ropes, denominated as life lines, which are tied to rafts, situated on each side of the deep water. The life lines, together with the rafts, mark the shallow water and distinguish it from the deep water. The middle part contains water ranging from 6 to 9 feet in depth, and on the side adjacent to the pool building are two life guard benches which are located on the corners of the middle part. Between the two life guard benches, on the side adjacent to the pool building, there are three springing boards and two ladders, and back of the middle springing board (which is positioned directly over the deepest part of the pool) there is a "Hell Diver," which is an elevated contrivance for use by expert divers. On the other side of the pool are two more life guard benches situated similarly to the benches heretofore described. Between

these benches are two springing boards and a ladder.

The life guard benches are built of wood extending upwards from the concrete foundation of the pool about 4½ to 5 feet in height. There are chairs placed thereon to be occupied by the life guards. These benches are built high from the ground so that the life guards may be in a position to observe all bathers using the pool. The stations are located on each of the corners of the middle part, and it is obvious that they are placed thus so that the guards, who are there to protect the lives of the bathers using the pool, may readily be of assistance to any person in danger of drowning.

On Saturday, June 3, 1933, Allen Rome, a boy 10 years of age, went to the city park swimming pool. He was driven there in the automobile of Mrs. William Neubauer. Accompanying him also were his companions Kenneth and Harold Neubauer and Robert Garic. The party arrived at the pool around 10 o'clock in the morning. The two Neubauer boys and the Garic boy had brought their bathing suits for the purpose of taking free swimming lessons, which were being sponsored that morning by the Times-Picayune Publishing Company. Allen Rome had neither a bathing suit nor 25 cents, which was the admission price to the swimming pool. Mrs. Neubauer left the boys at the pool and went on an errand to the grocery store. She says that she left Allen Rome on the outside of the pool. About 10:45 she returned and noticed that Allen Rome was in the pool and wearing a rented bathing suit supplied him by the city park. He told Mrs. Neubauer that, shortly after she left, a lady had given him 25 cents and he had purchased a ticket which entitled him to bathe in the pool. Mrs. Neubauer states that at the time she saw him he was splashing around in the shallow water. She further testified that at 11:40 she told the boys of her party, including Allen Rome, to get out of the pool.

Kenneth and Harold Neubauer and Robert Garic testified that they, with Allen Rome, left the swimming pool and went into the dressing room in accordance with Mrs. Neubauer's command; that Allen Rome borrowed a towel from Robert Garic; that his locker was two aisles from theirs; that they dressed immediately and went to the locker of Allen Rome to get him and found his towel on the bench and his locker untouched. They became alarmed by his ab-

sence and reported the fact that he was missing to one of the life guards. They thereupon went to the inclosure of the pool and one of the life guards ordered them to go back in the dressing room. In a few minutes they learned of the fact that Allen Rome's body had been found on the bottom of the pool.

The evidence of the life guards is to the effect that, as soon as the companions of the Rome boy informed them that he was missing, they went out to the pool to search for him. Schellinger, one of the guards, discovered the boy's body on the bottom of the pool near a drain, which is on the side of the pool nearest the building. Cellos, another life guard who was not on duty, immediately dove over and brought up the boy's body. First-aid treatment was administered, without result, and shortly after 12:20 p. m. the Charity Hospital ambulance arrived and the internes pronounced the boy dead.

The defendant has attempted to show that the Rome boy re-entered the pool after the whistle had blown at 12 noon, which was the time at which all bathers were required to vacate the pool, but in our view the evidence fails to justify such a conclusion.

There were no eye witnesses to the drowning, although there were approximately 300 bathers in the pool on that morning. There were two life guards on duty at the time. One of the guards, Arthur Von Wollf, was stationed at one of the life guard benches on the side of the pool opposite to the building. The other guard, Schellinger, was stationed on the side of the pool adjacent to the building, on the life guard bench diagonally across from Von Wollf. These guards came on duty at 6 a. m. and remained on duty until 12 o'clock noon, when the pool was closed. They both say that at no time did they see the Rome boy until after 12 o'clock when the pool was closed and his body was found. They maintain that they remained at their posts at all times during that morning and that, at 12 o'clock, they blew the whistle for the bathers to get out of the pool. It takes about five minutes to clear the pool and as soon as it was cleared these life guards went to eat their lunch; and, a short interval thereafter, they were notified that the child was missing and Schellinger discovered the body in the manner hereinabove set forth.

There was another life guard who testified for the plaintiffs, one George Cellos. He said his regular hours of duty were from 1 p. m. to 10 p. m.; that the manager of the pool, Mr. Condon, told him to come on duty on the day of the accident at 6 a. m. While this statement is not explained, it is evident that Condon was expecting a large crowd of bathers and thought that he might need additional life guards to handle the children. Cellos reported for duty on that morning, as he was directed to do, and was informed by Mr. Condon that his services would not be needed. Having nothing to do, he changed from his life guard bathing suit to another suit, which was supplied by the operators of the pool, and spent his time swimming. He swam for a while with a Miss Shirley Cox, leaving the pool about 11:25 a. m. He went to the life guards' lavatory, got his lunch, and sat eating it, at a point near the engine room door from 11:30 a. m. until 12:10 p. m. He testifies that the life guard, Schellinger, left his life guard bench at about 11:45 and that he, Schellinger, was stationed behind the bench from 11:45 to 12 talking to a chorus girl.

While the district judge was of the opinion that Cellos was not telling the truth, his testimony makes a profound impression upon us. He was cross-examined vigorously, without effect, and most of the statements made by him are not contradicted by the defendant's witnesses. Schellinger denies that he was talking to a chorus girl when he was supposed to have been on duty, but his testimony on this point is not convincing. On direct examination he said:

"Q. Were you talking to any chorus girls that day during the noon hour?

"A. No, that is the one time we have to keep our eyes open, because of so many children in there.

"Q. Was there anything especially going on there that day?

"A. No, sir."

On cross-examination he testified as follows:

"Q. Now why do you remember there were some chorus girls out at the pool about that time?

"A. That day?

"Q. No, during that period?

"A. I really don't know. There were none out there that day. There were some out there during the course of that week.

"Q. There were some out there during the week? -

"A. Yes.

"Q. How do you know they were not there that day? Did you look for them?

"A. No, why should I. I am a married man.

"Q. How do you know there were no chorus girls there that day?

"A. Because they were almost all children that day.

"Q. When those chorus girls were out there did you talk to them?

"A. No, why should I talk to them.

"Q. You bid them the time of day?

"A. I did."

An analysis of all of the testimony proves to our satisfaction that Allen Rome re-entered the pool between 11:40 a. m. and 12 noon and that in some manner unknown he was drowned in the deep water.

There were some 300 people in the pool on that morning and the defendant supplied only two life guards for their safety and protection.

With reference to the number of life guards employed by the swimming pool, Mr. H. Dabezies, chairman of the swimming pool committee of the New Orleans City Park Improvement Association, had this to say:

"Q. Now you had how many life guards employed during the 1933 season?

"A. That depends on the day of the week and the time of the day. There is never less than two life guards and Mr. Condon and at certain times there are four life guards and Mr. Condon.

"Q. Have you a set program for the time when you provide four life guards and Mr. Condon?

"A. That is up to the manager.

"Q. Have you any special days?

"A. Yes, Saturdays in summer when there are many children in park there are four life guards on duty and on special picnic days."

Obviously, from the testimony quoted above, and in view of the fact that the Times-Picayune Publishing Company was giving special classes for free swimming lessons, it was certainly the duty of the management of the pool to have more than two life guards to watch over the lives of 300 persons.

Condon, the manager, knew that there were to be a great number of children on hand for the occasion of the free swimming lessons and had prepared for the event by summoning the life guard, George Cellos, to be on hand. Why Condon did not place Cellos on duty we are at a loss to understand. He does not attempt to explain why he changed his mind or why he thought it was unnecessary to have Cellos or some other additional life guards present. It is evident to us that two life guards are inadequate to watch over and guard against dangers which might occur to 300 bathers.

The district judge was of the opinion that the burden of proof was upon the plaintiffs to show that the defendant was guilty of negligence proximately causing the drowning of their son. Counsel for plaintiffs, on the other hand, maintains that the doctrine of res ipsa loquitur applies, and he asserts that not only does the jurisprudence sustain him in his position, but that the Supreme Court maintained the application of the doctrine to the case at bar, at the time it overruled the exception of no cause of action filed by the defendant, and remanded the case for trial on its merits. We shall discuss these propositions in their order.

█ The doctrine of res ipsa loquitur is set forth in Corpus Juris, Vol. 45, page 1193, as follows:

"Where the thing which caused the injury complained of is shown to be under the management of defendant or his servants and the accident is such as in the ordinary course of things does not happen if those who have its management or control use proper care, it affords reasonable evidence, in the absence of explanation by defendant, that the accident arose from want of care."

This statement of the rule has been widely quoted with approval, so that the occurrence of an injury, under the circumstances above set forth, raises a presumption or permits an inference that the party charged was guilty of negligence.

It will be observed that in order to invoke the doctrine two essential elements must concur:

(1) The thing which caused the injury must be under the control and management of the defendant, and

(2) The accident must be such as, in the ordinary course of things, does not happen if those who have its management or control use proper care.

There are many exceptions to the rule and the decisions have not been entirely in accord in its application, the court, in each case, being guided by the particular accident in question.

█ As an abstract proposition it would seem that the mere fact that a young boy, who could not swim, was drowned in a swimming pool is not such an unusual occurrence from which could be drawn an inference or presumption of negligence on the part of the pool proprietors. In the case at bar, however, this young boy was a paid patron of the swimming pool. For the price of 25 cents he was given a bathing privilege. The owners of the pool had the onus of protecting him from injury, and they recognized this obligation by employing life guards, whose duties were to protect his life and the lives of others who entered the pool. It was also the obligation of the pool operators to have a sufficient number of life guards employed, so that this little boy and other children could be watched with reasonable care, and not to allow more persons to bathe in the pool than could be successfully protected by the operators' employees.

█ Keeping in mind the burden placed upon the proprietors of the swimming pool by virtue of their contractual undertaking, the little boy bathes in that pool and is drowned without the life guards seeing him or knowing whether or not he was in distress, notwithstanding that the portion of the pool in which he was drowned is located at a point not over 15 or 20 feet from one of the life guard stations.

Under these circumstances, we are of the opinion that a presumption of negligence arises against the proprietors of the pool, in that, if the life guards had been doing their duty and had been attentive, they would have discovered the presence of the boy in peril.

A presumption of fault, on the part of the owner, does not arise merely because a person is drowned in his swimming pool. But where a person is drowned in a pool policed by life guards supplied by the owner under a contract with the deceased, and those guards have failed to see the drowned person in distress, either because of the fact that the pool was overcrowded, or because they were not alert and vigilant in the exercise of their duties, then, in such

case, it will be presumed that if the life guards had been attending to their task, they would have discovered the peril in time to rescue the life.

In the case at bar, there is direct evidence of the fact that between 11:45 a. m. and 12 a. m., Schellinger was not paying attention to his duties, but was engaged in conversation with another bather.

In Lonatro v. Palace Theatre Company, 5 La.App. 386, this court held that a petition which charges injury to a patron sitting in the parquette of a theater from a bottle falling from an upper tier disclosed a cause of action, and that there was a presumption of negligence arising from the fact of the injury that the defendant did not conduct its theater in a prudent manner. In the course of the opinion Judge Claiborne, as the organ of the court, said:

"The responsibility of managers of theatres may be compared to that of lessors or innkeepers, and the responsibility of a carrier is compared to that of innkeepers. C.C. art. 2751."

■ A proprietor of a swimming pool is in the same category as the proprietor of a theater, and it is his duty to exercise due diligence and care to see that none of the patrons of the pool are injured through his fault.

■ When a person is drowned under circumstances such as these, viz., where life guards are employed to watch over the bathers and fail to see them in distress, a presumption of negligence arises.

This presumption has not been rebutted by the defendant. The evidence shows a plain lack of prudence on the part of the operators of the pool. Mr. Dabezies testified that when the pool was crowded, the manager would have on hand four and sometimes five life guards. On the day of the accident there were 300 persons in the pool and only two life guards. There is no explanation given by the manager why he did not have more than that number of life guards on hand. Furthermore, there is also direct evidence of negligence on the part of the life guard Schellinger.

When this case was appealed to this court from the judgment maintaining the exception of no cause of action, the defendant answered the appeal setting forth in the alternative that "the petition herein discloses no cause of action against ap-

pellee, assured, * * * in that no legal fault on the part of said assured is alleged in said petition." When the case was considered by the Supreme Court on writ of certiorari, the defendant maintained, in its brief, that the exception of no cause of action "which would be good if the insured were not a state agency, in that the petition shows that the drowned boy, 'a minor ten years of age * * * was residing with them and was under their supervision and control', who could not swim, was found drowned in nine feet of water. How or why he was drowned is not shown and no fault on the part of the insured causing his death is revealed. All of the allegations in which liability is sought to be fixed as against the Park Association are mere arguments and conclusions. In any event, should this Court not see fit to pass on this exception pleaded in the Court of Appeal, and on the exception of vagueness, it is respectfully submitted that if the decision of the lower court be overruled for any reason these exceptions would be reserved to defendant." The Supreme Court remanded the case for trial on the merits and evidently did not believe that the point raised by the defendant was meritorious, because although the question was succinctly presented by the defendant, in its brief, the court does not mention the point in its opinion. It was pertinent for the court to pass upon the question inasmuch as the charges of negligence contained in the plaintiffs' petition are not specific allegations, but mere conclusions of law, and if the exception of no cause of action was good, it could have been sustained on either of the contentions urged for by the defendant.

■ Defendant has filed a plea of contributory negligence, asserting that the plaintiffs had forbidden Allen Rome to go in swimming and that by reason of his disobedience of plaintiffs' command he was guilty of such negligence as to bar recovery. We find no merit in this contention, as the child's failure to obey has no causal connection with the drowning.

For the foregoing reasons, we are of the opinion that the plaintiffs are entitled to recover.

■ This leads us to the question of quantum of damage. The plaintiffs have asked for $10,000, but we find in the jurisprudence that the amount of allowance to parents for the wrongful death of

their children is from $2,000 each to $3,000 each. See Vuillemot v. Aug. J. Claverie & Co. et al., 12 La.App. 236, 125 So. 168; Jacoby v. Gallaher, 12 La.App. 477, 126 So. 86; Ziegler et al. v. Lamantia, 13 La.App. 70, 126 So. 262; Drago v. Dorsey, 13 La.App. 115, 116, 126 So. 724; Wyble et ux. v. Putfork (La.App.) 141 So. 776; Bosarge et ux. v. Spiess & Co. et al. (La.App.) 145 So. 21. In view of these authorities, we are of the opinion that damages in the sum of $2,500 each for the mother and father would be adequate under the circumstances.

It is therefore ordered, adjudged, and decreed that the judgment of the district court be and it is hereby annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that there be judgment herein in favor of Mrs. Antoinette Louque, wife of Nicholas Rome, and Nickolas Rome, plaintiffs, against the defendant, London & Lancashire Indemnity Company of America, in the full sum of $5,000 with legal interest from judicial demand until paid, in the proportion of $2,500 to the mother of the deceased and $2,500 to the father, and for all costs of court.

Reversed.

WESTERFIELD, Judge (concurs).

I am convinced that our Supreme Court is not in sympathy with the doctrine announced by us in the case of Loustalot et al. v. New Orleans City Park Improvement Association et al., 164 So. 183. See Edwards v. Royal Indemnity Company, 182 La. 171, 161 So. 191. It is apparent also that in reversing this court (181 La. 630, 160 So. 121) by overruling the exception of no cause of action which we had sustained, the Supreme Court in effect expressed approval of the doctrine of res ipsa loquitur as applicable to this case.

I, therefore, respectfully concur.

JANVIER, Judge (dissenting).

I cannot agree with the opinion of my associates on the question of law which is principally involved here, and, in order to set forth clearly my view, I deem it advisable to restate the entire case.

Mr. and Mrs. Nicholas Rome brought this suit against London & Lancashire Indemnity Company of America, which corporation had issued a policy of liability insurance to New Orleans City Park Improvement Association. Plaintiffs claimed damages for the death of their minor son, who was drowned in the swimming pool operated by the said association in the city park of New Orleans. The suit is brought directly against the insurance carrier under the provisions of Act No. 55 of 1930 and the association itself is not made a party defendant.

Defendant insurance carrier, by exception of no right or cause of action, challenged the right of plaintiffs to maintain an action against it, contending that New Orleans City Park Improvement Association exercises only governmental functions delegated to it by the state of Louisiana, and that, therefore, since it is exempt from liability for loss resulting from the torts of its employees or agents, defendant, its insurer, cannot be held liable for such loss.

When the matter was first before us on exception (156 So. 64), we held that since the petition charged that the said association was operating the swimming pool as a proprietary function and for profit, and since there was also a further allegation "that the fee charged for the use of the said pool by the said Association was and is the same fee as the customary fee charged by private corporations operating swimming pools in the City of New Orleans," we should remand the matter that evidence might be introduced touching upon the question of whether or not the said pool was being operated as a proprietary function and for profit. We then granted a rehearing and in 157 So. 175, 176, on rehearing, held that the New Orleans City Park Improvement Association could not, within the limits of city park, operate any business as a proprietary function and for profit and that, therefore, regardless of the allegations of the petition, we were required to assume, as a matter of law, that the said swimming pool was not being operated as was alleged in plaintiff's petition.

However, the Supreme Court granted a writ of certiorari and on review that court held (181 La. 630, 160 So. 121) that, in view of the fact that the petition contained the allegations to which we have already referred, it could not be presumed in the absence of proof that the said swimming pool was not being so operated for profit and as a proprietary function. The Supreme Court, therefore, overruled the exception of no right or cause of action and reinstated our original decree, remanding the matter that evidence touching upon the question referred to might be introduced.

The evidence was then adduced in the district court and a judgment rendered in favor of defendant London & Lancashire Indemnity Company, and, from this judgment, plaintiffs have appealed.

There are two questions which are involved and which must be answered before it becomes necessary, or even possible, to consider the evidence touching upon the facts of the case. Both of these questions were referred to in the two opinions rendered by us and in the opinions rendered by the Supreme Court. The first is whether or not, under the facts as shown by the record, it appears that the said association was operating the swimming pool as a proprietary function, and the second is whether the insurer may be held liable in a direct action against it regardless of whether there could have been a judgment rendered against the association had it been made a party defendant.

The evidence concerning the charges made by the association for the use of the pool is confined to the testimony of Mr. Hypolite Dabezies, chairman of the swimming pool committee of the New Orleans City Park Improvement Association. He testified that a "charge is made of a sufficient amount to cover the costs of operation." He stated that when the pool was erected it was determined to attempt to fix a charge for the use thereof which would produce as nearly as possible the exact amount of the costs of operating the said pool and that, although, in the year during which the accident in question occurred, the actual gross revenues from the pool had exceeded the actual gross expenses of operation by about $500, this result was not entirely correct because there had not been taken into consideration the cost of water which the city of New Orleans furnished free, nor any sum for repairs or depreciation. He said, also, that there were no salaries charged in connection with the executive management of the pool nor of any portion of the park, though, of course, lifeguards and other employees connected with the pool were paid for their services. It thus appears that, as a matter of fact, the only charge made for the use of the pool is based on the actual cost of operation as nearly as it is possible to estimate the charge necessary to accomplish that result and that the sole and only purpose and object of the association is to derive sufficient funds to operate the pool for the benefit of the general public.

In our original decision, which decision was adopted by the Supreme Court as correct, we considered a great many cases involving the question of whether or not a charge made for the operation of public playgrounds, recreation centers, etc., could be considered as changing the character of the operations from governmental to proprietary, and we reached the conclusion that "where the city or governmental agency engages in a proprietary function for profit, the exemption from liability for tort is forfeited, unless the case can be brought within the exception to the rule that the charge or fee was merely incidental to the discharge of the governmental function and not for the purpose of revenue or gain." It would serve no useful purpose to review the many authorities which we cited at that time.

The evidence which this record now contains justifies the conclusion that the fee charged "was merely incidental to the discharge of the governmental function and not for the purpose of revenue or gain." It is true that, in the particular year in question, the cost of operating the pool itself was $5,968.80, whereas the gross revenues therefrom was $6,413.55, but there are three things which must be taken into consideration—one is the expense of water and other such items which have not been included, the second is the fact that no funds have been set up for repairs and rehabilitation of the pool when such repairs become necessary, and the third and most important is that, though a small profit may appear for that particular year it is obvious that the sole purpose of the association was to attempt to produce a revenue as nearly as possible equal to the expense. There may be years, of course, in which a small profit will result from the charging of a fixed fee, but it is equally obvious that there may be other years in which a loss will result, and it is evident that, if it be held that exemption from liability results only where there is no profit at all, then, in order to be on the safe side, an association such as that under discussion would find it necessary to fix a charge which would result in a slight loss each year, otherwise there would always be the danger that potential tort liability might come into existence. The real question is not whether or not a small profit or a small loss results, but whether the bona fide purpose of the association is to fix the charge at a figure which will not produce

profit, but which will approximately offset the actual cost of operation.

In view of the evidence, I feel that the charge that the pool was being operated as a proprietary function and for profit has not been sustained and that, therefore, there could have been no recovery against the association itself had the association been made a party defendant.

The next question and one which has given much concern is whether or not, regardless of the absence of liability in the association itself, the insurance carrier which issued a policy of liability insurance may, because of the provisions of Act No. 55 of 1930, be held in a direct action where the principal to which the policy was issued may not, as a matter of law, be itself held.

This question was adverted to in the original opinion rendered by us but was not discussed; nor was it discussed in the majority opinion rendered by the Supreme Court. It was, however, discussed by Mr. Chief Justice O'Niell in a concurring opinion in which he expressed the view that, whether or not the municipal corporation may be held liable, the insurer of the municipal corporation may not be heard to shield itself behind the personal immunity which might have been asserted by the association had the suit been brought against it. Because of the views expressed in that concurring opinion, we gave to the question considerable thought when it was presented to us in the matter of Loustalot et al. v. New Orleans City Park Improvement Association et al., 164 So. 183. In that case there was presented squarely the question now under consideration and we reached the conclusion that since no action could have been brought against the defendant governmental agency, no action could be brought independently and directly against the insurance carrier of the said agent in that case, as here, New Orleans City Park Improvement Association. We considered and discussed two decisions rendered by the Supreme Court of Louisiana in each of which there is language which may be construed as indicative of the view that there may be a direct action against the insurer even where the principal to whom the policy is issued may not be sued.

These cases are Edwards v. Royal Indemnity Company, 182 La. 171, 161 So. 191, and Ruiz v. Clancy, 182 La. 935, 162 So. 734. We found, however, that in each of those cases there was a substantial dif-ference which we felt authorized the view that neither was necessarily controlling nor decisive of the legal question which we were considering, and which we found most confusing.

In the Edwards Case the plaintiff married the principal defendant the day after she had filed suit against him. Therefore, the immunity of the husband to suit by her and the incapacity of plaintiff to prosecute the suit against her husband did not exist at the time the suit was filed because, at that time, he was not her husband.

The situation which was presented in Ruiz v. Clancy, supra, we also considered in the Loustalot Case as one presenting only relative and not absolute immunity. In that case there was involved the question of whether children basing their action on the tort of their father might bring suit against the insurance carrier of the owner of the automobile, which was being operated by the father of the children. The contention was that, since the children could not have sued the father, had the father lived, they could not maintain the action in question. The Supreme Court held that the minor children of the deceased, though they could not have sued the father, might maintain an action against the administrator of the father's estate after his death, and that, therefore, they might maintain the direct action against the insurer of the owner of the automobile which he was operating; in other words, that there might be a direct action.

We, therefore, concluded in the Loustalot Case that neither of the cases mentioned required the adoption of the view that, where there has never existed a right to sue the principal and the exemption from liability, because of immunity, is absolute, the insurer may be sued in a direct action.

If the Supreme Court had felt that the immunity of the principal, whether relative or absolute, was not important, and that, in any event, the insurer might be sued directly, regardless of the status of the principal, then it seems that there was no necessity for the extended discussion into which the court entered in both of the cases and in which it evidenced a necessity for reaching the conclusion that, in each of the cases, the immunity of the tort-feasor was merely relative and not absolute.

It is said that one of the reasons, if not the principal reason, for the recognition of

the rule of immunity of a governmental agency from liability for damage resulting from tort is the fact that the public fisc is involved; that any judgment would decrease the public funds, which are dedicated to other purposes.

From this premise it is argued that where, as here, there is an insurer and that insurer is sued directly and no judgment is sought against the governmental agency, the reason for applying the rule of immunity does not exist because the payment of the judgment will be made not from the public fisc, but from the private funds of the insurer.

But the truth of the matter is that the result of a judgment holding that, in a suit of this kind, the insurer may be held liable will be the prompt increase in the premium rate which the insured will be required to pay and which all other similar governmental agencies will also be required to pay on similar policies.

In the fixing of their rates, insurers do not dispense charity. Their premiums must produce, in the aggregate, a sum sufficient to pay all losses and to leave something for operating expenses and for reasonable profits to shareholders.

In Corpus Juris, Vol. 32, Verbum "Insurance," at page 1193, it is said that:

"The amounts of premiums are based on the amount of liability for which the company may become liable under the policy."

In Encyclopedia of Social Sciences (The Macmillan Company, 1932), Vol. 8, page 101, in an article on the principles underlying the making of insurance premium rates, appears an interesting discussion in which it is stated that the risk involved must be taken into consideration and that the rate must be based on the principal that, if a large number of persons, whose businesses involve similar risks, should associate themselves together for the creation of an insurance fund, each would pay into the common fund an amount which, if added to the amounts paid in by all the others, would create a total sufficient to pay all the losses and leave a reasonable amount for operating costs. A similar discussion is to be found in Encyclopedia Britannica, Vol. 12, page 452. If it is established that an association of this kind may be liable in a matter of this kind, then the rate which the insurer will immediately charge will, theoretically at least, in the end and in the aggregate, accumulate a fund equal to the amount of all losses which will have to be paid.

There may be cases in which an association such as that involved here may be liable for the torts of its employees, or may be liable as the result of the nature of the business in which it engages. In this very case the Supreme Court has already held that, if the charge made was more than commensurate with the cost of operating the pool, or, if the charge made was based competitively, with those made by other private swimming pools, there might be liability. Furthermore, it may be that in the future some court will hold that such an association may be liable for damage caused by defective sidewalks. It has already been firmly established that municipalities are liable for such damage.

Taking these contingencies into consideration, it is obviously advisable that such an association as defendant's principal should protect its possible liability by the purchase of liability insurance. As we have already shown, the rate of premium on such insurance is necessarily based on the reasonable possibility of liability. If the insurer will be liable only for such risks as the principal could be held for, then the risk assumed by the insurer will be small and the premium low. But if the insurer may be held liable for all risks solely by reason of the fact that it is an insurer and regardless of whether the principal is a governmental agency exercising a governmental and not a proprietary function, then the risk is as great as if the principal were a private corporation, or a private agency, and the rate which the insurer will find it necessary to charge will be the same as that which would be charged against a private corporation, or a private agency. As I have shown, the charge which must be made against a private corporation or a private agency must be sufficient to produce, in the aggregate, an amount sufficient to pay all losses.

It thus follows that in the end and in the aggregate the premiums which are paid by the insured should equal and, in fact, should slightly exceed the amounts which the insurer must pay out for losses sustained in behalf of the insured. In other words, the principal pays the losses out of premiums through the intermediary, which is the insurer. Therefore, since, through premiums which the association will be required to pay, if there is any liability directly in the insurer, the public fisc of the

association will be immediately and directly affected by any decision holding that the insurer may be held liable directly and regardless of the immunity of the principal.

Having shared the views which were set forth in the Loustalot Case, I cannot at this time adopt any other conclusion than that, regardless of the evidence concerning the negligence or nonnegligence of the employees of the association, and this evidence I have not considered, there can be no liability in the insurance carrier of the defendant association.

I respectfully dissent.