REID, Judge.
Plaintiffs, as surviving mother and father, brought this suit for damages allegedly sustained by them arising out of the death by drowning of their seventeen year old son, Edmond Rodrigue Jr., which plaintiffs allege arose out of the negligence of the defendant, Ponchatoula Beach Development Corporation, in the operation of its premises, a public bathing resort located in the Parish of Tangipahoa, Louisiana.
The Trial Court awarded a judgment in favor of the plaintiff Edmond J. Rodrigue Sr. in the sum of $15,000.00, plus $1,667.72 for funeral expenses, doctor bills, hospital bill and drugs, and the sum of $20,000.00 to Mrs. Lucia Rodrigue for the loss of her son together with shock, mental pain and anguish, and awarded expert fees to Dr. Wallace W. Fleetwood and Dr. H. J. Ville-marette in the sum of $50.00 to each.
The plaintiffs contend that the negligence of the defendant consisted of its failure to maintain and have present qualified lifeguards and life saving equipment and in failing to adequately warn patrons of dangerous conditions which existed on a sand beach operated by the defendant, and as a result of such negligence their son, Edmond J. Rodrigue, Jr., drowned on April 17, 1960, while on the defendant’s premises as a paid guest and invitee.
The defendant denies that there was any negligence on its part and contends that even if there was any negligence on its part the plaintiffs are precluded from any recovery by the assumption of risk doctrine, and in the alternative by the contributory negligence of the deceased. They contend that the contributory negligence of the deceased was the proximate cause of the accident.
The facts show that the deceased was 17 years of age, was the only son of the plaintiffs, and that on April 17, 1960, he, together with his parents and a group of friends, went to defendant’s property and paid an admission charge for the use of its grounds. The record further shows that the defendant had an agent at the entrance gate who collected the admission charge. Neither the deceased nor his parents had previously been to the defendant’s beach. It is established that the defendant’s operation was a profit making operation. Defendant rented bathing suits, towels and bath house facilities for changing clothes.
There is nothing in the record to indicate that any inquiry was made by either the plaintiffs or the deceased as to the bathing facilities, nor were there any verbal instructions given as to what areas of the beach were approved for swimming and what areas were not approved for swimming.
Although there is some slight evidence to the contrary, the record is clear that the deceased was at best a very poor swimmer, if in fact he could swim at all.
April 17, 1960 was opening day for the season at the beach. The weather was cool and not many people were at the beach. The only life guard on duty that day was *159 Mr. Welles, the President of the defendant corporation, who was not in a bathing suit, and who was not at the beach at the time of the drowning but was at the gate house where admissions were collected, approximately 200 yards from the area where the drowning took place. The record shows that Mrs. Welles was in the pavilion for the purpose of keeping an eye out for anyone going in swimming and to notify Mr. Welles immediately if anyone did go in swimming. She did not see the deceased go in swimming as the place where the drowning took place was not in the roped off swimming area but was approximately 175 feet from the rear portion of the pavilion. The testimony as to whether or not there was actually a roped off swimming area or warning signs is conflicting. The plaintiffs and their witnesses testified there was not a roped off area and no warning signs on the picnic area site nor the spot where the deceased drowned. The defendant on the other hand produced witnesses who testified that there were ropes marking off the swimming area and signs nailed to the trees in the area of the drowning warning of the dangerous conditions at that location. The testimony of Mr. and Mrs. Welles was to the effect that there was a sign a few feet from where the deceased drowned which read “an adult must guard, caution deep water.” The Trial Court concluded that there was an area near the pavilion which was roped off and tagged with signs indicating that this roped off area was the intended bathing area and further that there were signs of warning located at the beach area not roped off and across the river on the opposite side of the river where the deceased had pad-died himself on an inner tube. The Trial Court held that these signs were not of a sufficient size and nature to adequately warn newcomers to the beach nor were they placed in such prominent locations as to be clearly seen by those not accustomed to the facilities.
Upon arrival at the defendant’s beach the deceased and one Claude Barrios, who was approximately 16 years of age at the time, put on bathing suits and went to the beach and into the water near the pavilion and in the roped off area. The records show that the deceased did not himself swim but waded in the water at the edge of the water. After lunch the entire party, with the exception of the father, Edmond Rodrigue Sr., and one other member of the party, went in bathing at a portion of the beach which was to the left of the pavilion and on a portion of the beach which was not roped off. It appears that across the river from the point where the party went in swimming there was a rope swing in a tree which was also outside of the roped off area. The swimming party crossed the river and used the rope to swing and drop into the water. The deceased did not attempt to use the swing. There is-evidence in the record that when asked if he wanted to jump off the rope he .replied, “Do you think I want to drown myself”. In the meantime the deceased had' paddled himself across the river and back on an inner tube at least once and possibly two or three times, and on one return trip when approximately 15 to 20 feet from-the shore on the defendant’s beach side several members of the party noticed that the inner tube was floating away from him and’ that he appeared to be in trouble. The deceased’s mother was on the shore and screamed for help. One Earl Domingue, a member of the party who, as the record' discloses, was a good swimmer, though not a lifeguard, came to the deceased’s assistance immediately and attempted to save him. He testified as follows:
“A: And the girl — I believe it was his sister, holler, ‘He is going under’, and I was there, I was between five and ten yards. She holler, I turn my head around and I see him going under. I ran out and dove in the water, and I grabbed him. He brought me over — I don’t know about 15 or 20 foot of water. I don’t know how deep it is there. We went straight for the bottom. *160 He had me around my neck, and I have him about around the waist, and I got him up for air, and try to knock him out, and he was taking me down for the second time, and I grabbed him again more tighter and he came up for air again with me, and the third time he got away from me at the bottom- — all the way to the bottom. I stayed there a few minutes trying to look for him under water.”
Robert Stanga, who was an off duty lifeguard, also was present and immediately went into the water and dove for the body. There were several other members of petitioners’ party present and who also attempted to save the deceased. John Welles arrived approximately three minutes after the drowning and aided in the search for the body which was found some two hours later a few feet from the place where he had last been observed.
The Trial Court, after reviewing the evidence, concluded that had the defendant had a lifeguard on duty, even at the pavilion some 175 or 200 feet away, he could have reached the boy in time to save his life and further concluded that the defendant had not performed is affirmative duty, being duly aware that the water at the point where the deceased drowned was much deeper and more treacherous than the area where roped off it took no steps to safeguard the decedent, or even to warn of the unusual depth of the water, and that “such action violated its duty as clearly as if defendant had placed a dangerous trap on its premises unbeknowing to the decedent.”
The issue before this Court is whether or not the defendant failed to safeguard the decedent and warn him of the dangerous condition of the water, which together with its failure to have a lifeguard on duty at the time of the drowning, would cause the defendant to be liable for the drowning of a 17 year old normal youth who admittedly could swim little, if at all, and who, in the presence of one of his parents and other members of his party, went into a river at a depth over his head in an area not designated for swimming and which had some signs warning of its dangerous condition. The Trial Court resolved this issue in favor of the plaintiffs. This Court is not in accord with this view.
In regard to the failure of the defendant to have a lifeguard on duty at the time of the drowning, it would appear from the record that it cannot be said with any degree of certainty that had a lifeguard been on duty he could have prevented the drowning. The record clearly shows that the mother of the deceased noticed his plight almost immediately and that Earl Domin-gue, who was a good swimmer, immediately reached his side and attempted to save him as shown by a portion of his testimony quoted above. The record also discloses that an off duty lifeguard, Robert Stanga, was present and went immediately to the rescue of The deceased. It should be further pointed out that Earl Domingue who attempted to save the deceased testified that he had previously saved someone else from drowning. As the area where the parties were swimming was not the regular swimming area, if a lifeguard had been on duty at the pavilion some 175 or 200 feet away, or at the regular beach area, it is doubtful he could have reached the boy as soon as the other parties did. It is, therefore, not clear that the failure to have a lifeguard on duty was the proximate cause of the drowning of the deceased. Therefore, it is the opinion of this Court that the mere failure of the defendant to have a lifeguard on duty was not the proximate cause of the drowning of the decedent.
With regard to the finding of the Trial Court that the defendant had failed in its affirmative duty to safeguard the decedent or warn him of the unusual depth of the water, it should be pointed out that although the defendant did not specifically forbid the deceased nor warn the deceased or his parents of the dangerous condition of the water at the point where the drowning *161 occurred, and although there is evidence that the warning signs may not have been entirely adequate, we are here dealing with a situation where an apparently normal 17 year old boy who could swim but little, if at all, went into deep water in the presence of his mother, in an inner tube, and at a portion of the beach other than that clearly marked for swimming and in the presence of various other members of his party drowned. The record shows that in the morning of the day of the drowning the boy had gone into the water but had not attempted to swim in the safe area where swimming was normally done but had merely waded in the water, thus showing his inability to swim. There is also evidence in the record to show that other members of the party had been designated to watch the boy in the inner tube and in fact Claude J. Barrios in his deposition filed in the record testified that the decedent had been informed by other members of his party not to go swimming. This testimony he later repudiated at the time of the trial. We not only have a situation wherein the boy himself is of such an age that he should be aware of the dangerous act which he was undertaking but being a minor under the control of his parents he undertook this act with the full knowledge and consent of his parents, one of whom, his mother, was present during the entire incident. There is no evidence introduced in the record which would show that the area where the drowning took place was unsafe for people who could swim and that it was restricted for that reason. There is nothing to indicate that if the defendant had a lifeguard on duty, in view of the age of the youth and in view of the fact that he was with a swimming party, the lifeguard would have been under any duty to have directed the deceased to leave the water. It is further shown by the record that both the deceased and his parents were aware of the fact that there was a roped off swimming area and despite this fact the boy went to another part of the beach which was not specifically designated for swimming.
The Trial Court cites as authority the case of Rome v. London & Lancashire Indemnity Co. of America, La.App., 169 So. 132. In the Rome case a 10 year old boy was drowned in a swimming pool apparently under the eyes of a lifeguard who was on duty and was not attentive to his job. The Rome case is clearly distinguishable from the case at issue in that here we have a situation where a 17 year old boy, who cannot swim and who is aware there is no lifeguard on duty goes swimming in a portion of the river which is not designated for swimming in full view of and with the consent of his parents, who also know that he cannot swim, that there is no lifeguard on duty, and that the area where he is swimming is dangerous. This is certainly a different situation than one in which a 10 year old boy drowns in a swimming pool in the presence of a lifeguard who was not attending to his duties. In this regard, however, it should be pointed out that in the case of McKenna v. City of Shreveport, 16 La.App. 234, 133 So. 524, it was held that a 10 year old child under the weight of authority is chargeable with the knowledge of the danger of drowning.
The defendant cites many cases from other jurisdictions regarding the question of whether or not youths of similar age, of normal intelligence, are chargeable with the knowledge of their ability to swim and with the danger of swimming in deep water, and that this knowledge acts as a bar to recovery in cases involving drowning. It is not necessary for this Court to go into these cases. It suffices to say that it would be common knowledge that the deceased herein must have been aware of the risk he undertook and that his action in so doing was a contributing factor to the accident, and that in view of the fact that this act was done with the knowledge and consent of his parents, the plaintiffs herein, they are not only barred by his contributory negligence but by that of their own in permitting their son to do what he did.
It is therefore, the opinion of this Court that although the defendant might not *162 have adequately made the decedent and his parents fully aware that the'water at the point where the boy drowned was unsafe and treacherous and that such action on the part of the defendant was negligent, nevertheless, the action of the deceased in going into the water where he did, and that of his parents in permitting him to do so, bars their recovery for his death.
For the foregoing reasons it is ORDERED, ADJUDGED AND DECREED that the judgment of the Lower Court be reversed and judgment rendered in favor of defendants, rejecting plaintiffs’ demands and dismissing this suit at their cost.
Reversed.